ARK.] TAYLOR v. McCLINTOCK. 243

---

TAYLOR v. McCLINTOCK.

Opinion delivered June 22, 1908.

1. WILLS—TESTAMENTARY CAPACITY—TEST.—The test of testamentary capacity is that the testator shall have capacity to retain in memory, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and to appreciate the deserts and relations to him of others whom he excludes from participation in his estate. (Page 273.)

2. SAME—RIGHT TO WILL PROPERTY.—Every man has an untrammeled right to dispose of his property by will as he pleases, within the statutory limitations. (Page 274.)

3. SAME—MORAL INSANITY.—Moral insanity, manifested in jealousy, anger, hate, resentment, or other perversion of the sentiment or affections, however violent and unnatural, will not defeat a will, unless it is the emanation of a delusion. (Page 274.)

4. SAME—INJUSTICE.—Testators are not required to mete out equal and exact justice to all expectant relations, and the motives of partiality, affection or resentment by which they may be influenced are not reviewable; and if one have the capacity to make a will, he may make it as eccentric, injudicious and unjust as caprice, frivolity or revenge can dictate. (Page 275.)

5. SAME—MENTAL CAPACITY—RANGE OF EVIDENCE.—When the mental ca-
·pacity of a testator respecting a particular person is questioned, a
wide range of evidence is admissible to show the state of his feel-
ings and thoughts, as manifested by his words and acts toward such
person, and generally, in so far as these tend to prove mental capa-
city or the lack of it in making the will and whether the testator
at the time was dominated by delusions concerning the person that
caused him to make it; it being admissible to show the facts and
circumstances before and after the making of the will, the will's
contents, the manner in which it was written and executed, the·
nature and extent of the testator's estate, his family and connec-
tions, their condition and relative situation to him, the claims of
particular individuals, and the situation of the testator himself.
(Page 275.)

6. SAME—TEST OF TESTAMENTARY CAPACITY.—The test of testamentary
capacity is the same in the case of an insane delusion as in the case
of dementia. (Page 275.)

7. SAME—INSANE DELUSION—PROVINCE OF COURT AND JURY.—Upon an
issue as to the testamentary capacity of a testator, it is for the court
to define delusions, announce the rules for their ascertainment, and
declare their effects, and for the jury to determine whether a delu-
sion existed. (Page 276.)

8. SAME—PARANOIA DEFINED.—"Paranoia," or partial insanity, designates
the form of insanity characterized by systematized delusions, or
those delusions which, being based upon a false premise, are pursued
by a logical process of reasoning to an insane conclusion. (Page 276.)

9. SAME—EFFECT OF PARANOIA.—Paranoia or partial insanity invalidates
a will which is its direct offspring, or where the will is the effect
or result of such insanity, though the testator's general capacity
is unimpeached. (Page 276.)

·10. SAME—INSANE DELUSION.—While insane delusions invalidating a will
cannot be predicated upon purely abstract subjects which are not
susceptible of proof, they may be predicated upon the testator's belief
that his daughter does not love him, or love him as well as she
does some others, or is ungrateful toward him; but his belief that
his daughter does not love him as much as he wishes or as she
ought, or that she is not as grateful as he wishes or as she should
be, cannot be shown to invalidate the will, as such belief is specula-
tive, and cannot be disproved. (Page 278.)

11. EVIDENCE—BODILY OR MENTAL FEELINGS.—When one's bodily or mental
feelings are in issue, the usual expressions of such feelings as are
made at the time in question are original evidence. (Page 279.)

12. WILLS—DISTINCTION BETWEEN MISTAKE AND INSANE DELUSION.—The
distinction between a mistake and an insane delusion is that a mis-
take, whether of fact or law, moves from some external influence
which is weighed by reason, however imperfectly; while a delu-

sion arises from a morbid internal impulse, having no basis in rea-
son. (Page 280.)

13. SAME—SANITY—BURDEN OF PROOF.—The burden of proof is upon one
who attacks a will upon the ground of the testator's insanity; and
if the testator's general capacity be conceded, the proof of his partial
insanity must be of the clearest and most satisfactory kind. (Page
280.)

14. INSTRUCTIONS—APPLICABILITY—CONSTRUCTION.—Instructions should be
confined to the issues, should be based on the evidence, and should be
considered as a whole. (Page 280.)

15. SAME—APPLICABILITY TO EVIDENCE.—Each party has the right to have
the theory he contends for, and which he has adduced evidence
to support, submitted to the jury upon proper instructions, unless
the court in its general charge has declared the law so that the re-
spective contentions of the parties may be presented in argument
to the jury without unfairness or prejudice to either party. (Page
281.)

16. WILLS—INSANE DELUSION—INSTRUCTIONS.—It was prejudicial error,
in a case where medical experts had been permitted to give an in-
correct definition of the term delusion, to refuse to charge the jury
that "a belief which is founded on any evidence as a basis is not a
delusion." (Page 281.)

17. SAME—DELUSION—MORAL PERVERSITY.—In a contest by a daughter of
her father's will upon the ground that he labored under an insane
delusion that she did not care for him, it was error to refuse to
limit the inquiry as to the testator's mental capacity with reference
to such delusion, where the jury might have been misled by testi-
mony tending to show moral perversity on the testator's part which
might in the jury's opinion have rendered him incapable of com-
prehending his daughter's deserts. (Page 282.)

18. SAME.—Where one's testamentary capacity is attacked on the ground
that he possessed an insane delusion, it is not enough that the be-
lief should be false and without foundation of fact to rest upon,
but it must also have been adhered to against all evidence and
argument. (Page 283.)

19. SAME—INSANE DELUSION.—One may be mentally sound on all sub-
jects or as to all individuals save one, and as to that subject or
individual may be so diseased mentally as to render it impossible to
say that he is of sound mind. (Page 283.)

20. SAME—INSTRUCTIONS—APPLICABILITY.—Where the court, in a will
case, instructed the jury that if the testator did not have sufficient
mental capacity to understand his natural obligations to his daugh-
ter and her deserts as such he was of unsound mind, it was error
to refuse to instruct that if a testator has capacity to understand
his obligations to his children his mere disregard thereof does not
invalidate his will. (Page 284.)

21. SAME—WHEN EXISTENCE OF DELUSION IMMATERIAL.—Where a will executed by a father left to his daughter a proportionately small allowance, and the will was contested upon the ground that the father entertained an insane delusion that 'the daughter did not love him, it was error to refuse to instruct the jury that the existence of the insane delusion was not a ground for invalidating the will if the fact that the daughter married against her father's will was the cause of the discrimination against her in the will. (Page 284.)

22. APPEAL—HARMLESS ERROR.—While it is error to exclude testimony which tends to impeach the credibility of a witness, the error is not prejudicial if the information sought had already been substantially elicited. (Page 286.)

23. WITNESSES—COMPETENCY—TRANSACTIONS WITH 'TESTATOR.—Kirby's Digest, § 3093, providing that "in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate or ward, unless called to testify by the opposite party," has no application in a case involving a contest over the probate of a will. (Page 286.)

24. SAME—HUSBAND AND WIFE.—Kirby's Digest, § 3095, providing that "either husband or wife shall be allowed to testify for the other in regard to any business transacted- by the one for the other in the capacity of agent," does not authorize a plaintiff's husband to testify that as agent for plaintiff he copied a letter for her; the term "business transacted" referring to business transactions with third persons, and not between the husband and wife. (Page 286.)

25. APPEAL—HARMLESS ERROR.—Where a daughter contested her father's will upon the ground that he entertained an insane delusion that she did not love him, it was harmless error to permit her to state that she gave her father her confidence, and that she was frank and sincere in her dealings with him. (Page 287.)

26. SAME.—It was harmless error to permit contestant's witness to answer whether contestant exhibited "at any time any greater fondness for any person that she did for her father," the ground of contest being that the testator entertained an insane delusion that contestant did not love him. (Page 287.)

27. WILLS—DELUSION—EVIDENCE.—Where a will is contested upon the ground that the testator had an insane delusion that contestant, his daughter, did not love him, and the defense was that testator discriminated against contestant because she married against his will, it was competent to prove that the reputation of contestant's husband was good. (Page 287.)

28. SAME—DELUSION—CONTROLLING EFFECT.—Where a will is contested upon the ground of the testator's dementia, the inequalities of the

will, the nature and extent of the estate and the sources of its acquisition are proper to be considered in determining the testamentary capacity; but where an insane delusion is alleged as the ground of incapacity, such evidence is competent to establish the delusion only when it is shown that the testator was dominated by such delusion when the will was executed. (Page 287.)

29. SAME—SOURCE OF ACQUISITION OF PROPERTY.—In a contest by a daughter of her father's will, based upon the ground that he had an insane delusion that she did not love him, she could show what property of her mother passed into testator's hands and its value. (Page 287.)

30. EVIDENCE—MOTION TO EXCLUDE.—A motion to exclude all of the testimony of a witness was properly denied where part of the testimony was competent. (Page 288.)

31. EXPERT TESTIMONY—ARGUMENTATIVENESS.—Upon a will contest where the issue was as to whether the testator entertained an insane delusion as to his daughter's lack of affection for him, it was prejudicial error to permit the testimony of expert witnesses to assume an argumentative and speculative form as to the moral phases of testator's conduct toward his daughter. (Page 288.)

32. SAME—RELEVANCY.—It was not error, in a will contest wherein the issue was as to the testator's sanity, to exclude testimony as to what was the general character of the issues in a lawsuit in which the testator did all the work of preparation. (Page 288.)

33. SAME—SANITY.—It was not error to refuse to permit a witness, in a contest of a will upon the ground of the testator's insanity, to testify whether he had ever heard testator's sanity questioned until after his death. (Page 288.)

34. WITNESS—IMPEACHMENT AS TO COLLATERAL MATTER—Where a will was contested upon the ground of insanity of the testator, it was error to permit contestant to disprove statements of testator· in letters that during certain years he had made no money by farming by showing that another during the same years had made money elsewhere by farming, but the error was not prejudicial. (Page 288.)

35. SAME—EXAMINATION—COLLATERAL MATTER.—Upon the issue whether a testator was insane, where a witness testified that testator, as a bank director, sought information from the bookkeepers which he should have obtained from the cashier, it was not error to exclude evidence which would have shown that testator had once been held liable as director of a defunct bank because he accepted the officers' statements, instead of going to the books. (Page 288.)

36. EVIDENCE—HEARSAY.—It was not error, in a will contest, to exclude a question asked a witness as to whether it was understood that testator owned certain lands in 1863 or earlier. (Page 288.)

37. SAME—RELEVANCY.—In a contest of a will by the testator's daugh-

ter, it was not error to exclude a question asked of the attorney who prepared the will as to whether, in suggesting to testator that he give contestant, his daughter, a lump sum in lieu of an annuity which was suggested by testator, the attorney intended to reduce the benefit contestant would receive. (Page 280.)

38. SAME—COMPETENCY.—It was not error, in a will contest, after admitting evidence tending to show that the testator acquired property through his first wife who received it from a former husband's estate, to exclude testimony of one who had examined the .probate records and found that such former husband's estate was insolvent and paid but a small dividend to the creditors. (Page 288.)

39. SAME—RELEVANCY.—Where a daughter contested her father's will upon the ground of his insanity, it was error to permit contestant to ask the widow whether she notified the daughter of the father's illness. (Page 288.)

40. APPEAL—HARMLESS ERROR.—Where, in a will contest, contestant sought to establish that the testator acquired a large portion of his fortune through contestant's mother, who derived her property through a former husband, it was harmless error to allow contestant to show that such former husband had 3000 bales of cotton burned in 1863. (Page 289.)

41. EVIDENCE—EXPERT TESTIMONY—SANITY.—Where, in a will contest, the testator's mental capacity was in issue, it was not error to exclude a question asked of an expert witness as to what difficulty the testator's friends, family and acquaintances would have experienced in detecting his insanity if he was insane for 24 years before he died. (Page 289.)

42. SAME—QUALIFICATIONS OF EXPERTS.—Upon the issue of a testator's mental capacity it was not error to exclude questions asked physicians, who had stated that they were engaged in a general practice and had never made.a specialty of treating diseases of the mind and nervous system, whether a general practitioner is as competent to express an opinion upon a case of doubtful mental disorder as one who has made a specialty of diseases of the mind. (Page 289.)

43. SAME—SANITY—OPINIONS OF EXPERTS.—It was not error, in a will contest, to allow a physician to state his opinion as to the condition of testator's mind, and his opinion that the testator was not competent to dispose of his property so far as contestant was concerned, or to deal concerning matters in which she was involved. (Page 289.)

44. WITNESS—CROSS-EXAMINATION.—When a witness is cross-examined on a matter collateral to the issue, he cannot be subsequently contradicted by the party asking the question. (Page 290.)

45. DEPOSITION—IMPEACHMENT.—A deposition taken upon interrogatories, as provided by Kirby's Digest, § 3181, cannot be impeached at the trial because an attorney of one of the parties was present when

the deposition was taken, although the opposite party was not present or notified; the remedy, if the statute was not complied with, being a motion to quash the deposition. (Page 290.)

46. EVIDENCE—EXPERT TESTIMONY—HYPOTHETICAL QUESTIONS.—Hypothetical questions relating to a testator's sanity are misleading where they omit a material part of the facts which should·be considered in their determination. (Page 292.)

47. SAME.—Hypothetical questions must fairly reflect the evidence, and unless they do so the resultant opinion evidence is not responsive to the real facts, and can have no probative force. (Page 294.)

48. SAME.—Hypothetical questions must embrace undisputed facts that are essential to the issue. (Page 294.)

49. SAME.—In taking the opinion of experts upon hypothetical questions, either party may assume as proved all facts which the evidence tends to prove, and may elicit such opinion upon the whole evidence or any part thereof. (Page 294.)

50. SAME.—In framing hypothetical questions either party may state facts which he claims the evidence shows, whether the evidence is controverted or not, and the question will not be defective if there be any evidence tending to prove such facts. (Page 294.)

51. SAME.—When a party seeks to take the opinion of an expert upon the whole or any part of the evidence, it is the duty of the court to see that the hypothetical question is so framed as to prevent the opinion from misleading the jury by concealing the real significance of the evidence or by unduly emphasizing a part thereof. (Page 294.)

Appeal from Pulaski Circuit Court; *Edward W. Winfield,* Judge; reversed.

This is a contest over the validity of a will executed by Dr C. M. Taylor, who died April 15, 1905, leaving a widow, Julia P. Taylor, two children of the marriage with her, and a married daughter by a former marriage, Mrs. Maude J. McClintock.

Soon after his death his widow and the Union Trust Company presented to the probate court a document purporting to be his last will, executed by him on March 2, 1904, and naming them as executors and trustees. In this will Dr. Taylor gave to Mrs. McClintock $5000, and left the residue of his estate, consisting of land and personal property estimated to be worth $500,000, to his children by the second marriage, subject to the widow's dower.

The will was duly admitted to probate in common form. Thereafter in due time Mrs. McClintock appealed from the pro-

bate court to the circuit court, where she set forth as her ground of contest that Dr. Taylor, at the time he executed the will, was not of sufficiently sound and disposing mind to qualify him to make a will. On this issue there was much testimony tending to show that the testator entertained an insane delusion that his daughter, Mrs. McClintock, did not love him. There was also much testimony in rebuttal. This was the issue upon which the case was tried.

Numerous exceptions to the rulings of the court in admitting or rejecting evidence were taken by the proponents. These exceptions are numbered and referred to in appellant's brief as follows:

(1) The trial court refused to permit Miss Jordan, a witness for contestants, to answer the following question: "Don't you know it to be a fact that in that matter (meaning the suit of the Jordan heirs against Dr. Taylor) very great bitterness of feeling grew up on account of the difference between Colonel Johnson and Dr. Taylor, in which your feelings entered?"

(2) Mrs. McClintock, the contestant, was permitted to testify as to certain transactions or conversations with the testator.

(3) The court permitted contestant's husband to testify that he made a copy of a letter which she wrote to her father, dated May 7, 1895, and thereupon admitted the copy in evidence.

(4) The court permitted contestant to answer the question of her counsel, "In this letter it is stated that you failed to give your father your confidence when you were with him; please state if the statement in the letter is correct?" which she said was not correct; and also permitted her to answer the question, "I wish you to state what your course was in regard to advising and informing your father of your relation ·with Mr. McClintock during the entire period of your correspondence and engagement to him before your marriage," her answer being, "I was perfectly frank and sincere with him."

(5) The court permitted contestant to ask, and Miss Didlake to answer, the following question: "Did she (Mrs. McClintock) exhibit at any time any greater fondness for any person than she did for her father?" her answer being, "She did not."

(6)  The court allowed C. M. Alford, a witness, to answer two questions as follows: "Do you think you have sufficient knowledge of Mr. McClintock's character and reputation in the community in which he lives to speak in regard to his standing at the time this marriage took place? what was Mr. McClintock's standing and reputation in the community where he lived and in that neighborhood?"—his answer being, "Very excellent, commercially and socially." There was no proof that Dr. Taylor knew McClintock's reputation.

(8)  The objections urged to the admission of the evidence of Alford apply to the admission of similar evidence of George B. Nelson and Charles McKee.

(9) and (10)  The court permitted Colonel S. B. Johnson to answer two questions asked him, for the purpose of showing what property the contestant's mother owned, and what property passed to Dr. Taylor that had belonged to her. His testimony was that she left property worth from $100,000 to $105,-000, and that Dr. Taylor lived on the place which had been hers from her death until 1900. It is contended that this testimony introduced a foreign element in the case, and that it shed no light upon Dr. Taylor's sanity.

(11)  At the close of Colonel Johnson's testimony, the proponents moved to strike out all of it relating to the property of contestant's mother before her death, and her estate after her death, and to the condition thereof, on the ground that it was incompetent, irrelevant and immaterial; but the court overruled the motion.

(12)  The court allowed Dr. Pope and other experts, in testifying, to argue the fallacies in Dr. Taylor's mistake upon moral questions, particularly the right of a daughter to marry when and whom she would.

Thus, in answer to questions as to the ground upon which he based his opinion as to the testator's incapacity, Dr. Pope stated:

"In the first place, the fact that he had a delusion would be based upon the truth that his daughter was not without love and affection for her father, and therefore his entertaining the idea that she was without love and affection, that she was ungrateful

and undutiful, would be false, and it would therefore be a false belief held against such proof and evidence as would ordinarily be accepted by the average individual. That would be one of the reasons why I should think that he was not of sound mind. In the next place, I do not think that Dr. Taylor was of sound mind concerning his daughter because he did not take a healthy view of what his daughter's rights were. He didn't seem to understand and appreciate for one minute that a woman—or a man, for that matter, and more particularly a woman than a man—has the right, the legitimate, moral right, to look forward to the making of a home of her own. I would say that they have a legitimate right to marry, and that a father basing his objections to a marriage with a proper party, against whom there are no objections, and whose sole objection urged is not the securing of the happiness of his daughter by the marriage, but the only slight discomfort that might follow him, is evidently controlled by his own delusional ideas of what is his right rather than hers."

(13)   Judge U. M. Rose was called to testify as to Dr. Taylor's sanity, and to qualify him was asked to state the general character of the issues in a certain lawsuit wherein Dr. Taylor did all of the work of preparing the case, such as looking up the witnesses, and ascertaining what their evidence would be, in order to show what Dr. Taylor did and the manner of his performance. An objection to the question was sustained.

(14)   Captain W. H. Cooper, who knew Dr. Taylor for more than thirty years, after testifying that he never saw anything in Dr. Taylor to indicate weakness or unbalancing of the mind, was asked if he ever heard it brought in question until after his death. He was not allowed to answer it.

(15)   For the purpose of contradicting Dr. Taylor's statements in some of his letters that during certain years he had made no money farming in Lincoln County, a witness, Dr. O. P. Robinson, was permitted to testify that he found farming profitable in Pulaski County.

(16)   Oscar Davis, cashier of German National Bank, when testifying as to his observations of Dr. Taylor, stated that he was very painstaking, accurate, methodical and exacting, and that as a bank director he went to extremes by seeking informa-

tion of bookkeepers that he should have got from the cashier. He was asked if Dr. Taylor had not been previously held liable as director of another bank which failed, the object being to show that he was held liable because he accepted the statements of the officers, instead of going to the books. The court refused to permit the witness to answer this question.

(17) Captain Watkins was asked whether he understood that Dr. Taylor owned certain lands in 1863 or earlier, but was not allowed to answer.

(18) The court refused to permit proponents to ask John Fletcher, the attorney who drafted the will, whether he intended to reduce the benefit contestant would receive when he suggested to Dr. Taylor that he substitute an absolute gift of $10,000 for the annuity named when giving his first directions as to the will; the witness having testified that he could not remember the amount of the annuity indicated by Dr. Taylor.

(19) The court refused to permit proponents to show that the estate of Dr. Jordan, who was the first husband of Dr. Taylor's first wife, contestant's mother, was insolvent, paying but a small dividend to the creditors. By this proponents sought to rebut any imputation that Dr. Taylor acquired his fortune through his first wife.

(20) The court permitted contestant to ask Mrs. Taylor this question: "Did you send his daughter, Mrs. McClintock, any notice of his illness?" She answered that she did not, and stated her reasons for not doing so.

(21) In order to show the magnitude of Dr. Jordan's estate, a witness was permitted to state that "in 1863 they burned 3000 bales of cotton belonging to him."

(22) Dr. Broemer, a medical expert, was asked to suppose that Dr. Taylor had been in the first stages of paranoia as early as 1880, when he was about 50 years of age, that he had lived after the disease developed 24 years. Upon that supposition he was asked what difficulty his friends, family and acquaintances would have experienced in detecting that he was insane between the years 1895 and 1904. The question was excluded.

(23) Upon cross-examination of Drs. Green and Dibrell, each of whom stated that he was a physician in general practice

and had never made a specialty of treating diseases of the mind and nervous system, counsel for proponents asked them the two following questions:

"I will ask you, Doctor, if you feel that a man who is engaged in the general practice is as competent to express an opinion upon a case of doubtful mental disorder as a man of ability who has made a specialty of diseases of the brain and nervous system for a great many years?

"Do you believe that you are as capable of passing upon a case of doubtful mental disorder as if, since the beginning of your professional practice, you had devoted yourself as a specialist to the study and practice of mental and nervous diseases?"

The court refused to permit the witness to answer the questions.

(23½)  Dr. Morgan Smith, a medical expert, was permitted to state that Dr. Taylor was not competent to dispose of his property so far as contestant was concerned, or to deal concerning matters in which she was involved.

(24), (25) and (26)  These points are fully stated in the opinion.

The proponents asked the court to give the following instructions to the jury:

"1.  The issue to be tried in this case is whether the instrument of writing offered for probate is the last will and testament of C. M. Taylor, deceased.  Under the laws of Arkansas every person of the age of twenty-one years and over, of sound mind, may by last will and testament devise all of his estate, real and personal, as he sees fit.  He may discriminate between those equally related to him, or may dispose of his entire estate entirely to strangers, to the exclusion of all relatives.  By soundness of mind in this connection is meant the capacity of the testator to comprehend the nature of the transaction in which he is engaged at the time, to recollect the property to be disposed of and the persons who would naturally be supposed to have claims upon him, and to comprehend the manner in which the instrument would distribute the property among the objects of his bounty; if one who, at the very time he

undertakes to make a will, is possessed of sufficient intelligence and memory to fairly and rationally know and comprehend the effect of what he is doing, the nature and condition of his property, who are or would be the natural objects of his bounty, and his relations to them, the manner in which he wishes to distribute his estate among, or withhold it from, them, and the scope and bearing of the will he is making, and is not influenced in its provisions by an insane delusion with reference to any person who is the natural object of his bounty, he has capacity to make a will; and it is not necessary, where the mind is sound as above defined, that it should be free from prejudice or passion.

"The will in this case was executed and attested in accordance with the requirements of the statute, and the sole question to be determined by the jury is whether the testator at the time of making it was of sound mind as above defined. If he was of sound mind as above defined, the jury will find the instrument is his last will. If he was not of sound mind, the jury will find that it is not his last will. Upon this question the law presumes that the testator was of sound mind, and the burden is upon the contestant to prove by a fair preponderance of the evidence that he was not of sound mind.

"2. An insane delusion is a diseased state of the mind in which persons believe things to exist which only exist in their own imaginations, and with a persuasion so fixed and formed that neither evidence or argument can convince them to the contrary. The test in answering the question as to the existence of the delusion is, 'Can you in view of the evidence understand how any man in possession of his senses could have believed such a thing?'

"A belief which is founded on any evidence as a basis is not a delusion.

"A sound mind, when affected by mistaken beliefs, is not one perfectly balanced or free from prejudice or passion.

"One may form false and unjust opinions upon insufficient proof and be prompted by them, in making of his will, to exclude those most nearly related to him; but if they rest upon any evidence known to him as a basis, they do not incapacitate him to make a will or invalidate a will when made.

"3. Periodical expressions by Dr. Taylor of apprehensions, or even belief, that his daughter did not love him, or had been disobedient, or was undutiful, or had deceived him, which were made in a spirit of anger after some exciting provocation, and which did not become a fixed and abiding belief, controlling his action with reference to his daughter, would not be a delusion. Before the jury can find there is any delusion, it must find that there was an insane belief which was fixed and enduring and which controlled the mind and acts of Dr. Taylor with refrence to his daughter; and, to invalidate the will on that account, it must appear that such a delusion existed, and that it influenced the making of the will so far as it affects the contestant.

"4. The jury may consider unnatural and unreasonable provisions in a will, if there are any, in connection with all the evidence in the case, only for the purpose of determining whether the testator was of sound mind when he executed the will proposed; but, though the jury may find that the testator was not prompted by natural affection when he made the will, and that its provisions are grossly unjust, still if, upon all the evidence, they believe the testator was of sound mind, his will must be sustained.

"5. The only fact to be determined in this case is whether the mind of Dr. Taylor was sound, as defined in the instructions given, on the 2d of March, 1904, when he made his will. Many things said and written by him and many transactions with him and much of his conduct on other occasions have been admitted in evidence to aid the jury in determining the question of his sanity on the date above named. But these things are to be considered for that purpose and for that purpose only; and if upon all the evidence the jury does not find that he was of unsound mind on March 2, 1904, they will find that the writing propounded is his will, even though they may believe that in some of its provisions it is harsh or unjust, and though they may feel that if they had been in his position they would have made a different disposition of his property.

"6. You are instructed that the expert medical evidence which has been admitted in this case is the expression of the opinions of expert witnesses based upon a hypothetical state of

facts, and such opinions are not to be considered by the jury as binding upon them further than in the light of the evidence in the case and of the experience, knowledge and common sense of the jury they seem to be correct. In determining what weight or credence you should give to such opinions you should consider whether the hypothetical state of facts upon which they are based corresponds to, or conforms with, the facts in the case, as established by the evidence; and how far the opinions expressed reasonably seem to be true, taking into consideration all the evidence in the case, and the experience, knowledge and common sense of the jury on the subject about which the opinions are stated.

"7. No disorder of the moral affections, feelings or propensities, unless it is accompanied by insane delusion, will incapacitate a person to make a will or invalidate a will when made by him.

"8. In considering the evidence with respect to the beliefs, statements, and actions of the testator, the jury should proceed with care and caution, and should also consider the fact that by the death of the deceased it becomes impossible to obtain from him the reasons for his beliefs, if he entertained them, or what prompted him to do so or say the things done and said by him.

"9. Although the jury may believe from the evidence that the testator was at one time the victim of an insane delusion with respect to his daughter, to the effect that she did not love him, or that she was ungrateful to him, or that she had deceived him, still if they find from the evidence that upon her marriage the parental relations between them were broken off, and that such delusion no longer controlled his mind, and that in making his will he was influenced, so far as she was concerned, by the fact that she had married a man whom he disliked and against his will, the fact that he had entertained the insane delusion above defined, or any others of like kind, would not incapacitate him to make the will or invalidate a will which was made, (so far as it concerned her), on account of her marriage as above set out.

"10. A mistaken belief on the part of Dr. Taylor that his daughter loved Miss Jordan or Mrs. Laura Taylor or Miss Didlake more than she did him, or that she might come to love

87—9

them more, would not be an insane delusion. And, even if he entertained such a belief and that belief controlled his actions in making the provision which he made for her in his will, it would be no ground for holding that he was insane, or for invalidating the will.

"11. A mistaken belief as to the character or standing of Mr. McClintock is not insanity, and will not avoid the will.

"12. If the will propounded, so far as it affects the contestant, was made because contestant married, against his father's will, a man whom he disliked, or if this fact was one of the causes for making the will, in that particular the fact that the testator may have entertained a delusion with respect to the affections of his daughter would be no ground for invalidating it.

"13. In considering whether Dr. Taylor was laboring under an insane delusion at the time he made the will, you will distinguish whether the matter as to which it is claimed he was acting under a delusion was a matter about which he could obtain definite knowledge or could certainly ascertain whether he was mistaken, or whether the matter was one involving the feelings and resting entirely on opinion, about which he could not ascertain whether he was mistaken; for, even if he had a mistaken belief of a matter pertaining to the affections or feelings and resting entirely in opinion, this mistaken belief, alone, would not constitute an insane delusion; and, even if you find from the evidence that Dr. Taylor held the opinion that his daughter did not have the proper amount of affection for him, this was a belief which in the nature of things involved those vague impulses known as affections, must rest in opinion, and was not susceptible of certain and definite knowledge, and would not constitute an insane delusion.

"14. Jealousy is defined to be that state of mind when a person is troubled by suspicion or knowledge that the love, good will or success one desires to obtain or secure has been diverted from one's self to others; and, even if you find from the evidence that Dr. Taylor was jealous of the affections of Mrs. McClintock, if his jealousy was based on the fact that Mrs. McClintock had real affection for others, you are instructed that Dr. Taylor's jealousy, even though not warranted by Mrs. McClin-

tock's real affection toward him and mistaken, would not con-
stitute an insane delusion.

"15. An insane delusion is a conception of a disordered
mind which imagines facts to exist of which there is no evidence,
the belief of the existence of which is adhered to against all evi-
dence and argument to the contrary and cannot be accounted
for on any other reasonable hypothesis than that it is the prod-
uct of a diseased mind. One cannot be said to act under an in-
sane delusion if there is evidence, however slight or inconclu-
sive, which might have a tendency to create the belief, or a
suspicion of the truth of the facts on which the belief is based,
or if the condition of the mind results from an erroneous in-
ference drawn from facts which do exist, however irrational
or unfounded such inference may be; and, even if you find from
the evidence that Dr. Taylor was jealous of the affections of Mrs.
McClintock, and you further find that Mrs. McClintock had real
affections for others, (or that she deceived him in regard to
the objects of her affections, and that he afterwards discovered
such deceit, or that she was knowingly disobedient of his wishes
and that he learned of such disobedience), and his jeal-
ousy was due to the existence of such facts or any of them,
then you are instructed that his belief that Mrs. McClintock
did not have the affection for him that she should have had
(if you find that he held this belief) and his jealousy on this
account would be supported by some evidence, and would not
constitute an insane delusion.

"16. The fact that the testator gave to his young children
the bulk of his estate, after giving to his wife an amount slightly
in excess of that to which she was entitled under the law, and
of which he could not have deprived her, does not prove that
he was of unsound mind at the time.

"17. You are instructed a person has the absolute right
to dispose of his property by will as he sees fit, and the law
does not attempt to say who should be, or who should not be,
the objects of his bounty; nor does it inquire whether the will
is reasonable or unreasonable, just or unjust, or even whether
it is natural or unnatural, in dealing with what might be deemed
by others the natural objects of his affections. And, although
Dr. Taylor exhibited likes and dislikes among his relatives or

members of the family for which you might not discern an intelligible reason, or that his regard for his daughter was not such as you would expect from a father toward his child, or that he was prejudiced against her, and that the disposition of his property by the will was unnatural or unjust; or if you find that his affections were disordered, this is no ground on which the law will avoid his will, for even moral insanity, that is, disorder of the moral affections or propensities, alone, unless accompanied by insane delusion, is not sufficient to invalidate a will or to incapacitate a person to make one.

"18. Although the will may seem to others, not having the means of knowing what the testator knew, nor occupying his standpoint, nor having lived his life, nor knowing his secret affections and hates, unreasonable, injudicious and even unjust, that is no reason why it should be declared a product of a diseased mind.

"The testator has the right to make an unreasonable, unjust and injudicious will, and his neighbors, sitting as a jury, have no right to alter the disposition of his property, simply because they may think the testator did not do justice to his family connections. But, however unreasonable a will may seem, it must be sustained if it appears to have been a product of a sound mind, as defined in instruction No. 1 given in this case.

"19. The right of one of sound mind to dispose of his property by will is positively assured by law, is a most valuable incident to ownership, and is not dependent upon its judicious use. And a will so made cannot be set aside in law, although it may seem to the jury that its provisions are unfair or unjust, or they are not what would seem to the jury to be the promptings of natural affections, but rather appear to have been prompted by anger or resentment.

"20. If you believe from the evidence that the contestant married, against the will of her father, a man whom he disliked and did not wish her to marry, and that on account of such marriage he was influenced to make his will as he did with reference to her, and that he made it while of sound mind as defined in these instructions in accordance with a purpose of his own, you should find that the instrument of writing propounded is his will, and it should be sustained by you, even

though you may find that he had mistaken views with respect to the man that she married and her disregard of his objection, and that in making the will he discriminated unjustly and harshly against her.

"21. If a testator has the capacity to understand his obligation to his children, his mere disregard of such obligation does not render his will invalid. In such case he may make such disposition as he pleases; one which makes an unequal distribution amongst his children, as well as one which makes an equal distribution.

"22. A will can never be held invalid merely because anybody or even the jury may think it unreasonable or unjust. That is a matter that the law permits alone to the testator for his decision. Neither courts nor juries have any right to sit in judgment upon the justness or unreasonableness of a will, or to hold a will invalid merely because it seems to them to be unjust or unreasonable to any degree."

And the court gave the 4th and 6th of the instructions as asked, but refused to give the 1st, 2d, 3d, 5th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 16th, 17th, 18th, 19th, 20th, 21st and 22d as asked; and to its refusal to give each of the said instructions as asked. The proponents excepted.

The court modified the 1st, 2d, 3d, and 5th of the instructions as asked by the proponents, and gave them as modified as follows:

"1. The issue to be tried in this case is whether the instrument of writing offered for probate is the last will and testament of C. M. Taylor, deceased. Under the laws of Arkansas every person of the age of twenty-one years and over, of sound mind, may by last will and testament devise all his estate, real and personal, as he sees fit. He may discriminate between those equally related to him, or may dispose of his entire estate entirely to strangers, to the exclusion of all relatives. By soundness of mind in this connection is meant the capacity of the testator to comprehend the nature of the transactions in which he is engaged at the time; to recollect the property to be disposed of, and the persons who would naturally be supposed to have claims upon him, their deserts and relations to him; and to comprehend the manner in which the instrument would distribute

the property among the objects of his bounty.; if one who, at the very time he undertakes to make a will, is possessed of sufficient intelligence and memory to fairly and rationally know and comprehend the effect of what he is doing, the nature and condition of his property, who are or would be natural objects of his bounty, and his relations to them, the manner in which he wishes to distribute his estate among or withhold. it from them, and the scope and bearing of the will he is making, and is not influenced in its provisions by an insane delusion with reference to any person who is the natural object of his bounty, he has capacity to make a will; and it is not necessary, where the mind is sound as above defined, that it should be free from prejudice or passion.

"The will in this case was executed ·and attested in accordance with the requirements of the statute, and the sole question to be determined by the jury is whether the testator at the time of making it was of sound mind as above defined. If he was of sound mind as above defined, the jury will find the instrument is his last will. If he was not of sound mind, the jury will find that it is not his last will. Upon this question the law presumes that the testator was of sound mind, and the burden is upon the contestant to prove by a fair preponderance of evidence that he was not of sound mind.

"2. An insane delusion is a diseased state of the mind in which persons believe things to exist which only exist in their own imaginations, and with a persuasion so fixed and formed that neither evidence nor argument can convince them to the contrary. The test in answering the question as to the existence of the delusion is, "Can you, in view of the evidence, understand how any man in possession of his senses could have believed such a thing?"

"3. Periodical expressions by Dr. Taylor of apprehensions, or even belief, that his daughter did not love him, or had been disobedient, or was undutiful, or had deceived him, which were made in a spirit of anger after some exciting provocation, and which did not become a fixed and abiding belief, controlling his actions with reference to his daughter, would not be a delusion. Before the jury can find that there was any delusion, it must find that there was an insane delusion which was fixed and

enduring and which controlled the mind and acts of Dr. Taylor with reference to his daughter; and, to invalidate the will on that account, it must appear that such a delusion existed, and that it influenced the making of the will so far as it affects the contestant.

"On the other hand, if, taking all the evidence together and in connection with the provisions of the will itself, the jury shall find that C. M. Taylor was not of sound mind and capable of understanding and comprehending the desert of his daughter. at the time the will was executed, you are instructed that it was not his will.

"5. . The only fact to be determined in this case is whether the mind of Dr. Taylor was sound, as defined in the instructions given, on the 2d of March, 1904, when he made his will. Many things said and written by him and many transactions with him and much of his conduct on other occasions. have been admitted in evidence to aid the jury in determining the question on his sanity on the date above named. But these things are to be considered for that purpose and for that purpose only, and if upon all the evidence the jury does not find that he was of unsound mind on March 2d, 1904, they will find that the writing propounded is his will."

At the request of the contestant the court gave in charge to the jury instructions numbered 1, 2, 4 and 8 as follows:

"1. If the jury believe from all the evidence that C. M. Taylor, at any time prior to the execution of the paper offered for probate, entertained the belief that his daughter did not love him as a daughter should love a father, or love him as well as she loved other persons with whom she was intimately associated, or that she was, ungrateful or unappreciative of the love and care that he had bestowed on her, and if they further believe from all the facts and circumstances in evidence that such belief was false, and was conceived by him without any foundation of fact that a rational person, in the exercise of his reason would have acted on, you are instructed that he was laboring under an insane delusion; and if at the time he executed the will he was influenced by said delusion in making the disposition of his property with regard to his daughter, then the testator was of

unsound mind, was incapable of making a will, and your verdict will be for the contestant.

"2. If the jury believe from the evidence that C. M. Taylor did not, at the time the paper offered for probate was executed, have sufficient mental capacity to understand his natural obligations to his daughter, the contestant, and to comprehend her deserts as his daughter, he was not of sound mind within the meaning of the law and incapable of making a will, and they should find for the contestant.

"4. Although the jury may believe from the evidence that C. M. Taylor, at the time of making said will, knew what he was doing, could retain in his memory without prompting the extent and condition of his property, and comprehend to whom he was giving it, yet, if they further believe from all the facts and circumstances in evidence in this case that he was not mentally capable of comprehending the deserts and relations to him of his daughter, then they are instructed that the paper offered for probate was not his will, and their finding will be for contestant.

"8. A person may be entirely sound mentally on all subjects or as to all individuals save one, and as to that particular subject or individual his mind may be so diseased as to render it impossible to say that he is of sound mind' and is capable of reasoning and exercising a sound judgment in regard to the subject of such delusion, or of comprehending the obligations he may owe to the individual who is the subject of the delusion; and the jury are instructed, in considering the question as to the mental soundness of C. M. Taylor and his capacity to make a will at the date of the paper offered for probate, they should take into consideration all the facts and circumstances adduced at this hearing bearing upon his relations to his daughter and his alleged delusion in regard to the state of her affection for him. And if you find that he entertained an insane delusion in regard to her which in any way affected the disposition made by him of his property in his will, you will find for the contestant, notwithstanding you believe he was perfectly sane and sound mentally in all other respects, and was so regarded by his friends and business associates."

Thereupon during the argument of the cause the proponents

moved the court that instruction No. 4 asked on behalf of the contestant be modified as to read as follows:

"4. Although the jury may believe from the evidence that C. M. Taylor, at the time of making the said will, knew what he was doing, could retain in his memory without prompting the extent and condition of his property and comprehend to whom he was giving it, yet, if they further believe from all the facts and circumstances in evidence in this case that, on account of an insane delusion with respect to his daughter, he was not mentally capable of comprehending the deserts and relations to him of his daughter, then they are instructed that the paper offered for probate was not his will, and their finding will be for contestant."

But the court overruled the motion and refused to make the modification in the instruction, to which action of the court the proponents at the time excepted.

The proponents of the will moved the court to give a peremptory instruction to the jury to find a verdict in favor of proponents sustaining the will, which request was denied, and exceptions were duly saved.

The verdict was as follows: "We the jury find against the will." Judgment was entered accordingly, from which proponents have appealed.

*Ratcliffe & Fletcher* and *Rose, Hemingway, Cantrell & Loughborough,* for appellants.

1. Except in cases of dementia or loss of mind, which is not insisted on in this case, insanity consists of a delusion or delusions, and the existence of such delusions is the test of insanity. 1 Und. on Wills, § 91; 1 Redf. on Wills, p. 79, § 11; Page on Wills, § § 104, 105, 106; 3 Add. 79; 3 Humph. 278; 33 N. Y. 624. For definitions of delusion, see also 1 Whart. & Stille, Med. Jur. § 80; 48 S. E. 306; 3 Hagg. 527; 38 N. Y. 624; 45 N. J. Eq. 726; 62 Pac. 609.

2. Opinions held by one with reference to the sentiments of another are not delusions. Cases *supra;* 1 Whart. & Stille, Med. Jur. § § 83, 85, 86; Anderson's Law Dict. 339; 95 Ind. 165; 39 Atl. 816; 108 N. W. 380; 1 Redf. on Wills, c. 3, § 11, par. 8b and sub. 21; 16 Abb. Pr. (N. S.) 128, 185; 29 Pac. 1101; 31

Pac. 453; 38 Ala. 131; 30 N. Y. Supp. 388; 49 Wis. 183; 161 Ill. 122; 81 N. E. 1052.

3. Fears, suspicions or apprehensions that facts exist are not delusions. Und., Wills, § 95; 34 N. Y. 199; 25 Atl. 11; 60 Pac. 527.

4. A belief supported by any evidence or probability is not a delusion. Page on Wills, 126, 127; 1 Whar. & Stille, Med. Jur. § 83; Gardner on Wills, 118; Schauler on Wills, § § 162, 163; Und. on Wills, 127; 1 Redf. on Wills, c. 3, § 11, sub. 20 and note; 108 N. W. 379; 34 N. Y. 190; 3 Hagg. 527; 38 Ala. 131; 48 N. J. Eq. 570; 58 Atl. 535; 33 N. Y. Eq. 619; 67 Pac. 951; 39 Atl. 816; *Id.* 849; 24 N. Y. Supp. 928; 30 *Id.* 388; 41 Miss. 314; 25 Pac. 769; 62 Pac. 605; 67 Pac. 951; 96 N. W. 196; 16 S. E. 489; 1 Stew. Eq. (N. J.) 437; 81 N. E. 1044; 60 Pac. 527; 81 N. E. 482; 53 Md. 376; 110 Mass. 477; 2 McCart., 202; 17 Atl. 826; 55 N. E. 305; 77 N. Y. 533; 35 S. E. 278; 48 S. E. 306; 48 Pac. 130; 61 N. E. 856; 24 N. E. 937.

5. The evidence of the expert witnesses is not sufficient to sustain the verdict: (a) Because their opinions were based on medical tests of sanity. 1 Wig. Ev. § 680; 1 Whart. & Stille, Med. Jur. § § 68, 78; 66 Atl. 221; 3 Witthaus & Becker, Med. Jur. 183; 16 Barb. 259; 1 Rob. Eccl. Rep. 442; 47 N. H. 137; 32 La. Ann. 1055; 61 N. E. 652; 48 Wis. 294; 81 N. E. 1052; (b) Because their evidence is based upon a hypothetical case which differs from the real man. 66 Atl. 231; 116 Cal. 655; 15 N. J. Eq. 202; 61 N. E. 881; 55 N. E. 302; 64 Atl. 52; 95 S. W. 834.

6. Egotism and selfishness are not evidence of insanity. 1 Whart. & Stille, Med. Jur. 78.

7. The obvious, inherent weakness of contestant's evidence calls for fuller and more satisfactory proof than would be exacted in cases generally. Where witnesses are arrayed against each other in cases of this kind, they are inclined to distort, magnify or minimize the incidents they relate as their interest persuades. 66 Atl. 227.

8. When it becomes necessary, upon a *post mortem* inquisition, to define a father's belief with respect to affections of a daughter, and to state the reasons for the belief, it is im-

possible to ascertain or disclose the many things that contributed to his forming or adhering to it.   108 N. W. 380; 48 Wis. 294; 42 Mich. 202.

9.   Proof of delusions must be clear, full, direct and satisfactory.   1 Whart. & Stille, Med. Jur. § 100; 41 Miss. 291; 1 Add. Eccl. Rep. 283; 3 *Id.* 79.; 2 Eng. Eccl. Cas. 446; 48 N. J. Eq. 570; 78 S. W. 398; 29 Pac. 1101; 31 Pac. 453; 3 Hagg. 527; 24 Ala. 241.

10.   The reasonableness of testator's belief is shown by the time when it began, the persons he mentioned it to, his refraining from mentioning it to others, and the time when he ceased to speak of it.   His statements show a sane, rational purpose, and refute the idea of delusion.   Beck's Med. Jur. 564; 3 Add. Eccl. 79; 61 N. E. 856; 1 Abbott's Law. Dic. 619, "Monomania;" 62 Pac. 608; 25 Pac. 769; 41 Miss. 314; 1 Und. on Wills, 117; 61 N. E. 856; 2 R. I. 255; 6 Eng. Rep. 352; 3 Hagg. 527; 34 N. Y. 190.

11.   If the existence of a delusion were shown, the manner in which the testator proceeded in the execution of the will shows that it did not influence him then, but that he proceeded sanely to accomplish his own rational intention.   Verdicts against wills should not be permitted to stand when they appear to have been influenced by sentiment or sympathy, or where the facts are as consistent with sanity as with insanity.   31 Pac. 453; 108 N. W. 380; 12 N. E. 267; 55 N. E. 302; 103 N. W. 161; 107 N. W. 1057; 61 N. E. 856; 42 Mich. 233; 66 N. E. 374; 76 Mich. 391; 83 Ill. 62; 81 N. E. 1055; 5 Johns. Ch. 159; 32 La. Ann. 1062.

12.   If the disposition of the will was not solely imputable to the testator's alleged delusions but to other causes, such as contestant's marriage, it would not defeat the will.   1 Whart. & Stille, Med. Jur. § 84; 2 Eng. Eccl. Rep. 497; 45 Atl. 726; 39 Atl. 816; 36 N. J. Eq. 281; 37 N. J. Eq. 233; 107 N. W. 1057; 24 N. Y. Supp. 188; 2 Zab. (N. J.) 117; 78 S. W. 394; 33 Pac. 769.; 48 S. E. 306; 103 N. W. 61; 1 Redf. on Wills, 74 § 17; 51 Atl. 398; 1 Stew. Eq. (N. J.) 437; 10 *Id.* 234; 55 N. E. 302; 32 Mo. 421; 110 N. Y. 456; 24 Ala. 241; 32 Wis. 563; 48 Wis. 294; 15 App. Div. 567; 26 N. J. Eq. 523.

13.   The contestant is not a competent witness as to con-

versations and transactions with deceased. Kirby's Digest, §
3093; 1 Storer's An. N. Y. Code, 828, 829; 14 W. Va. 304;
80 Wis. 317; 99 N. W. 438; 45 Tex. 200; 111 N. Y. 246; 64
Barb. 189; 100 Ia. 129; 46 Ark. 306; *Id.* 378; 45 Ia. 156; 103
N. Y. 519; 26 N. Y. St. Rep. 242; 20 Hun, 166; 24 N. Y.
St. Rep. 332; 78 Hun, 43; 131 N. Y. 624; 6 Dem. 99; 1 Green-
leaf on Ev., 15th Ed. § 329 and note.

14. McClintock was not a competent witness to prove the
letters of his wife to deceased. Kirby's Digest, § 3095; 39 Atl.
202; 66 N. W. 720; 78 S. W. 686; 71 S. W. (Ark.) 947.

15. It was improper to admit testimony as to the reputation
of McClintock and his family. 31 Pac. (Cal.) 454.

16. Drs. Green and Dibrell, physicians in general practice,
having been examined on the part of appellee as experts on in-
sanity, appellant's questions to them, which were intended to
bring out whether or not they were as competent to testify as
experts on insanity as they would have been if they had made
a specialty of mental disorders, ought to have been answered.
It is for the court to pass upon the right of witness to testify
as an expert, but for the jury to pass upon the weight of such
testimony. Page's Expert Test. § § 33, 38; Stephen's Digest
Law, Ev. art. 129; 39 Vt. 227; 54 Atl. 38.

17. Dr. Morgan Smith should not have been permitted to
answer appellee's question. It is the province of the medical
expert to state whether the facts disclose sanity or insanity, and
of the jury to find from the evidence and the law, as declared
by the court, whether the capacity existed or was wanting in
the testator to dispose of property. 12 N. E. 270; 9 Yerg. 332;
10 Mich. 155; 32 Mo. 328; 35 Vt. 398.

18. The contradiction of Mrs. Taylor on collateral matter
which was purely irrelevant and immaterial was improperly
permitted. 1 Wharton on Ev. 559; 2 Wigmore on Ev. 1000-
1007; 72 Ark. 412; 59 Ark. 431; 30 Am. & Eng. Enc. of L.
1097; 58 Ark. 125; 34 Ark. 485; 87 S. W. 1140.

19. The court should have given a peremptory instruction
sustaining the will. The beliefs held by deceased with refer-
ence to the affections of his daughter relate to matters of feel-
ing that are inherently so uncertain, etc., as not to be the sub-
ject of insane delusions. 94 Ind. 167; 108 N. W. 380; 39 Atl.

816. The medical opinions were entitled to no weight, having been given upon a partial and unfair hypothetical case, and according to medical, not legal, tests of sanity. 66 Atl. 228; 83 N. W. 911; 61 N. E. 881; 55 N. E. 302; 64 Atl. 521; 95 S. W. 834. The alleged beliefs did not influence deceased to make the will, but appellee's marriage was the sole cause of their estrangement and of his discrimination against her. The burden was on the appellee. 57 Ark. 402; 78 S. W. 398; 45 Atl. 727; 145 Ind. 652; 94 Md. 403.

20. The eighth instruction is erroneous, in charging the jury that one can be entirely sound on all subjects, or as to all persons, except one, and be unsound mentally as to that one. 1 Redf. on Wills, c. 3, § 11; Page on Wills, 129, § 108; 3 Witthaus & Becker's Med. Jur. 175; Schouler on Wills, § 143; 13 Vesey, Jr., 87.

21. The law does not exact capacity to comprehend obligations of testator and deserts of kin, further than that they shall not be destroyed by delusions. 1 Whart. & Stille, Med. Jur. § 65; 3 Witthaus & Becker's Med. Jur. 393; 48 S. E. 306; 1 Jarman, 94; 108 N. W. 380; 29 Pac. 1104; 106 N. W. 1130; 55 N. E. 302; 33 Pac. 542; 31 Pac. 454; 33 N. Y. 623; 39 Atl. 817; 45 Atl. 727; 67 Pac. 953; 96 N. W. 202; 39 N. W. 153; 12 N. E. 267; 13 S. W. 250; 103 N. W. 61; 107 N. W. 1057; 16 S. E. 489; 41 Miss. 314; 16 Lea (Tenn.) 63; 7 Curt. 434; 3 Zab. 117; 118 Ill. 292; 49 Wis. 181; 62 S. W. 17; 10 S. W. 373.

22. The issue should have been confined to alleged insane delusions, and the court erred in refusing to modify its fourth instruction so as to confine the principle therein declared to the evidence in the cause. 66 S. W. 681; 34 So. 327; 30 Pac. 101; 12 N. E. 270; 95 N. Y. 511; 52 S. W. 846; 13 S. W. 252; 42 Mich. 206; 76 Mich. 391; 83 Ill. 62.

23. The first instruction given on appellee's motion is erroneous. 49 Wis. 183; 60 Pac. 530; 29 Pac. 530; 29 Pac. 1104.

24. No disorder of the affection, feelings or propensities, not accompanied by delusions, is insanity. 16 Am. & Eng. Enc. of L. 563; 54 Barb. 275; 1 Whart. & Stille, Med. Jur. § 78; 47 N. H. 120; 48 S. E. 307; 1 Add. Eccl. Rep. 283; 49 Wis. 183; 1 Jarman, Wills, 104; 32 Mo. 411; 20 Wash. 563;

1 Rob. Eccl. Rep. 442; 16 Barb. 259; 48 Wis. 294; 24 N. Y. 115.

25. The instructions should have been directed and confined to the particular beliefs relied upon as delusions. 45 Ark. 263; 37 Ark. 598; 58 Ark. 205; 52 S. W. 864; 13 S. W. 252; 108 N. W. 379; 18 Ark. 521; 23 Ark. 289; 55 Ark. 581; 76 Ark. 233; 80 Ark. 440; *Id.* 457; 58 Mo. 307; 34 So. 327; 24 Ga. 640; 109 N. W. 1015; 62 Pac. 609.

26. The court erred in admitting proof as to the value of Mrs. Taylor's estate. 112 N. W. 8.

27. The nature of deceased's beliefs must be judged from the situation he was in and what he knew, saw, and might reasonably feel. 108 N. W. 380; 42 Mich. 206; 28 N. J. L. 274; 94 Ind. 167.

28. Speculative opinions or assumptions stated by witnesses are not testimony. 65 Ark. 542; 61 N. W. 356.

*Allen & Duncan, C. J. Bronston* and *Moore, Smith & Moore,* for appellee.

1. The manifestations of a delusion are governed to a large extent by the general characteristics of the person possessing the delusion. The natural reserve and self-control of a man of strong mentality would enable him to check any morbid tendency to garrulity in connection with his delusion. 109 N. W. 1015.

2. In order to determine the capacity and its free action at the time the will is made, a wide range of inquiry is permissible into the facts and circumstances, both before and at the time of making the will. 29 Ark. 157.

3. Objections to hypothetical question not made below are waived. 66 N. W. 687; 41 N. W. 494.

4. The rule in propounding a hypothetical question is that the party may assume as proved all facts which the evidence in the case tends to prove, and it is not necessary that the facts stated in the hypothetical question should be uncontroverted. 24 N. W. 482; 76 N. W. 720; 66 N. W. 687.

5. Distinction between legal and moral insanity. 54 Barbour, 289; Wharton & Stille's Med. Juris. § 78.

6. Characteristics, disposition, temperament, peculiarities of mind and temper, physical, mental and nervous conditions at

various periods, course of conduct and dealings in the various transactions of life of the testator, are competent in order that the jury may intelligently determine whether they indicate mental unsoundness or the existence of insane delusion. 29 Ark. 157; 31 *Ib.* 311; 1 Wigmore on Evidence, § 233, foot page 290, 292.

7. The contestant was a competent witness in her own behalf as to transactions with and statements of the testator, although not called to testify by the proponents of the will. 79 Ky. 607; 90 Ky. 36; 58 Mich. 58; 24 N. W. 824; 103 Mich. 21; 61 N. W. 354; 88 Pac. 338; 39 Atl. 465; 29 S. E. 608; 89 S. W. 665; 94 N. W. 705; 37 N. J. Eq. 528; 13 So. 451; 99 Mass. 112; 24 Atl. 253; 46 Me. 233; 89 Ill. 205; 55 N. E. 373; 12 So. 187; 71 Tenn. (3 Lea) 617; Wigmore on Evidence, 578.

8. The husband of contestant was a competent witness to prove the copy of letters of contestant to her father, written about her interest in her father's estate, about which her husband was advising her, it being a business transaction in which the husband acted in the capacity of agent. 39 S. W. 817; 16 Pac. 75; 18 Pac. 227; 16 Wis. 257; 68 Ark. 180; 62 Ark. 32.

9. The opinion of the contestant on the question of whether she gave her father her confidence, and whether she was confiding, frank and sincere with him, was competent. 3 Wigmore on Evidence, p. 2549, § § 1917-1919; 69 Mich. 436.

10. Testimony of Col. B. S. Johnson as to the extent and value of the property of contestant's mother which passed into the hands of the testator was competent. 1 Underhill on Wills, § 105.

11. The fact that the testator makes an unnatural and unjust disposition of his property may be taken into consideration upon the issue of incapacity as well as upon the question of undue influence. 1 Underhill on Wills, § 105; 17 Ala. 84, 88; 48 Ind. 502, 509; 105 Ind. 457; 39 Conn. 405; 90 Iowa, 656, 659; 57 N. W. R. A. 601; 5 Gill & J. (Md.) 260; 58 Md. 58; 110 Mass. 477, 488; 121 N. C. 336, 28 S. E. R. 519; 26 S. W. R. 657; 26 Wis. 104, 116 (1865); 122 Ind. 266, 23 N. E. R. 771; Page on Wills, § 385, pp. 454, 456; 145 Ill. 405; 151

Ill. 156; 90 Ia. 656; 106 Ia. 203; 96 Ky. 120; 114 Mo. 35; 121 N. C. 336; 106 Ia. 233, 63 Conn. 365; 90 Iowa, 656; 5 Gill & J. (Md.) 269; 27 N. Y. 9; 29 Ark. 157; Page on Wills, § 386, p. 457; 18 S. E. 29; 48 Pac. 127; 49 Pac. 172. Evidence of experts was competent, although they give opinions which touch the very issue before the jury. 3 Wigmore on Evidence, § 1921, and cases cited in note.

12. A delusion may be predicated upon a false belief entertained as to the feelings and affections of one's child. Wharton & Stille's Med. Juris. § 86; 16 Abbott's Pract. (N. S.) 128, 185; 1 Add. 279; 39 Atl. 816; 5 N. E. 129. The existence of any emotion, hatred, malice, affection, fear and the like is usually evidenced by conduct or by utterances indirectly indicating the feeling that inspires them. Wigmore on Evidence, § 1730; see also § § 1715, 349 and 190. 10 Cush. 255; 22 Ark. 93.

13. Definitions of an insane delusion: 16 Barbour, 259; Redfield on Wills, c. 3, § 11, subdivision 21, marginal page 87; 3 Add. 79, 60 Hun, 51; 54 Barbour, 289; 121 Ill. 376; 35 Hun, 658; 48 N. J. Eq. 578; L. R. 1 Pro. & D. 402; 10 Moore, P. C. C. 247; 20 Ore. 249; 33 N. Y. 624; 45 N. J. Eq. 744.

14. Although there may be evidence to support a belief entertained by the testator, yet he would be laboring under an insane delusion if he believed in the existence of a fact which no sane person would believe under the circumstances of the case. 35 Hun, 656; 170 Pa. St. 282; 24 Ala. 248; 2 Harr. (Del.) 375; 66 N. W. 681; 5 *Ib.* 549; 68 Conn. 428; 54 N. W. 511; Wharton & Stille's Med. Juris. par. 83; 16 Am. Rep. 473.

15. The testator must be able to comprehend the deserts and to understand his obligations to the natural objects of his bounty. 24 N. E. 118; 49 Ark. 372; 64 Ark. 351; 66 N. W. 681; 83 N. W. 909; 5 N. E. 131; 24 N. E. 119; 87 S. W. 1139; 76 N. W. 721; 85 S. W. 1084; 76 N. E. 760.

16. The question of whether a person may be insane on one subject and sane on all others is a question of law, to be determined by the court. 54 Ark. 601; 64 Ark. 534; 70 Ark. 174; 3 Add. 79, 2 Engl. Enc. Rep. 443; 51 Am. Dec. 258-9; 17 Atl. 828 *et seq.* (N. J.); 5 N E. 131-134 (Ill.); 30 Atl.

1056 (Pa.) ; 66 S. W. 17-19 (Ky.) ; 50 Am. Dec. 353 (Ga.).; 127 Ala. 16; 33 N. Y. 624-640; 109 N. W. 1015 (Ia.) ; 54 N. W. 217 (Wis.) ; 170 Pa. St. 282; 16 Am. Rep. 476 (Me.) ; Wharton & Stille's Med. Juris. § 80 *et seq.,* 4 Words & Phrases Judicially Defined, 3644, title, Insane Delusion.

WOOD, J. Appellee contends that her father, at the time the will was executed, was under the insane delusion "that she did not love him, did not love him as a daughter should, or love him as well as she loved other persons with whom she was intimately associated, and that she was ungrateful for and un-appreciative of the great love and care that he had bestowed on her."

Appellants contend that Dr. Taylor was sane when he executed his will, and that its provision discriminating against appellee was because of her marriage.

Conceding that the evidence tended to support the respective contentions, we will consider the law applicable to such cases, and then apply it to the instructions in the case at bar.

I. The test of testamentary capacity, as declared by this court, is that the testator shall have capacity "to retain in memory, without prompting, the extent and condition of his property, and comprehend to whom he was giving it, and be capable of appreciating the deserts and relations to him of others whom he excluded from participation in the estate." *McCulloch* v. *Campbell,* 49 Ark. 367; *Ouachita Baptist College* v. *Scott,* 64 Ark. 349. This rule is supported by the weight of authority. 1 Wharton & Stille, Med. Jurisprudence, § 67 and note; 1 Clevenger, Med. Jurisprudence of Insanity, § 287 and note 1.

The test relates, not to the moral quality of the act done, but to the mental capacity of the testator to do what he did. The question is, not whether the testator did actually appreciate the deserts of and relation to him of the one excluded, but whether he had, at the time, the capacity to do so. "It is not required that he shall in fact correctly ascertain the legal status of each person who apparently stands in natural relation to him. In the exercise of reason, he may move upon false or insufficient evidence, or by mistake of law, and thus exclude from his bounty those whom, but for this error, he would have recognized. Stupid error, either in his reasoning or conclusion, is not lack

of testamentary capacity." *Smith* v. *Smith,* 48 N. J. Eq. 566; 1 Wharton & Stille, Med. Jur. § 767, p. 73.

There is a clear distinction between having the capacity to comprehend deserts and actually comprehending them—the former the law requires, the latter it does not. Jurors, in their desire to "even up" what may seem to them the gross inequalities of a will, are apt to take the one for the other, and treat them as convertible terms. Care, therefore, should be taken by the courts to see that the distinction mentioned is observed, for it is precisely the one that public policy dictates and the law requires in order to preserve the right and power of testamentary disposition. *Greenwood* v. *Greenwood,* 3 Curteis, 337; In re *McDevitt's Case,* 30 Pac. 101; *King* v. *Rowan,* 34 So. (Miss.) 327; *Riggs* v. *Am. Tract Soc.,* 95 N. Y. 511.

Every man has the untrammeled right to dispose of his property by will as he pleases, with only such limitations as the statute may impose. The "English law," said Lord Chief Justice Cockburn, "leaves everything to the unfettered discretion of the testator, on the assumption that, though in some instances caprice or passion, or the power of new ties, may lead to the neglect of claims that ought to be attended to, yet the instincts, affections and common sentiments of mankind may be safely trusted to secure, on the whole, a better disposition of the property of the dead, and one more accurately adjusted to the requirements of each particular case, than could be obtained through a disposition prescribed by the stereotyped and inflexible rule of general law." *Banks* v. *Goodfellow,* L. R. 5 Q. B. 549.

Therefore, nothing short of mental unsoundness, when measured by the test above announced, will avoid a will. Moral, or what the books term "medical," insanity—a perversion of the sentiments and affections—manifested in jealousy, anger, hate or resentment, however violent and unnatural, will not defeat a will unless the emanation of a delusion. *Lucas* v. *Parsons,* 24 Ga. 640; Schouler on Wills, 162, 163; Wharton & Stille, Med. Jur. 78; 16 Am. & Eng. Enc. (2d Ed.) 563; *McClintock* v. *Curd,* 32 Mo. 411-421, 422; *Frere* v. *Peacocke,* 1 Robertson, Eccl. Cas. 448; *Bohler* v. *Hicks,* 48 S. E. 307; *Boardman* v. *Woodman,* 47 N. H. 120; In re *Forman's Will,* 54 Barb. 274; 3 Witthaus & Becker's Med. Jur. 183.

"Testators are not required by law to mete out equal and exact justice to all expectant relations in the disposition of their estates by will, and the motives of partiality, affection or resentment, by which they naturally may be influenced, are not subject to examination and review by the courts." *Barricklow* v. *Stewart,* 72 N. E. 128; *Clapp* v. *Fullerton,* 34 N. Y. 190. If one has the capacity indicated to make a will, then he may make it as "eccentric, injudicious and unjust as caprice, frivolity or revenge can dictate." *Schneider* v. *Vosburgh,* 106 N. W. (Mich.) 1130; In re *Spencer's Estate,* 31 Pac. 454; *Rivard* v. *Rivard,* 66 N. W. 681.

Still, "mind is represented by feeling, thought, and volition, and any departure in these from their normal relations" tends to show mental disorder. 3 Witthaus & Becker's Med. Jur. 182. Therefore, when the mental capacity of a testator to make a will with reference to a particular individual is questioned, it is always proper to show the state of his feelings and thoughts, as manifested by his words and acts towards such individuals, and indeed generally, in so far as these tend to prove mental capacity, or the lack of it, in making the will, and whether the testator at the time was dominated by delusions concerning the individual that caused him to make it. Hence it is that, in order to determine the capacity of the testator's mind and its true action at the time the will is made, a wide range of inquiry is permissible into facts and circumstances, whether before or after the time of making the will, the better to enable the jury to determine the probable state of the mind, and the extent and force of the restraint at the time the will was executed. "The contents of the will, the manner in which it was written and executed, the nature and extent of the testator's estate, his family and connections, their condition and relative situation to him, the terms upon which he stood with them, the claims of particular individuals, the situation of the testator himself and the circumstances under which the will was made, are all proper to be shown to the jury, and often afford important evidence in the decision of the question of the testator's capacity to make the will." *Tobin* v. *Jenkins,* 29 Ark. 151, pp. 157-160, quoting 1 Jarman on Wills, 79.

The test of testamentary capacity is necessarily the same,

whether the insanity be attributable to dementia or insane delusion—paranoia. While appellee's plea against the will was broad enough to cover dementia, or general insanity, the evidence tends to show, and appellee only contends for, paranoia or delusional insanity. So we will next consider "delusion" and as synonymous with insanity.

It is for the court to define delusions, announce the rules for their ascertainment, and declare their effects. It is for the jury to find whether a delusion exists in any given case. 1 Clevenger, Med. Jur. of Insan. pp. 308-309, § 23; *Prather* v. *McClelland,* 76 Tex. 574; *Robinson* v. *Adams,* 62 Me. 369.

"Paranoia" is a term used by medical experts, alienists and authors on medical jurisprudence to designate the form of insanity characterized by systematized delusions. A systematized delusion is one based on a false premise, pursued by a logical process of reasoning to an insane conclusion. 1 Wharton & Stille, Med. Jur. § 1020 *et seq.* There is one central delusion, around which other aberrations of the mind converge. The term "paranoia" takes the place of the word "monomania" or "partial insanity," and includes all that was formerly meant by that word, but is considered a more accurate term to describe the peculiar form of delusional insanity we are now considering. 1 Wharton & Stille, Med. Jur. § 1022; 1 Clevenger, Med. Jur. of Insanity, 860.

Mr. Clevenger, in his excellent work on Medical Jurisprudence of Insanity, says that "the theory of medical science that there is no such thing as partial insanity, and that a man is either sane or insane, is not true in law; and that to establish unsoundness of mind it is not necessary that it should be general, it is sufficient if proved to exist on one or more subjects, though in all other respects the individual may conduct himself with the utmost propriety. Within this rule partial insanity or monomania invalidates a will, which is its direct offspring, or where the will was in any way the effect or the result of such insanity, though the testator's general capacity was unimpeached." 1 Clevenger, p. 293, § 15.

Our own court, in *Seawel* v. *Dirst,* 70 Ark. 166, said: "The law now recognizes the fact, well established by the investigation and observation of medical experts, that there may be

a derangement of mind as to a particular subject and yet capacity to comprehend and intelligently act on other subjects. * * * * The fact that the grantor was a monomaniac, and possessed of insane delusions on some subjects not connected with the conveyance or the matters out of which it grew, is not sufficient to invalidate his deed. To have that effect, the insane delusion must be such as to disqualify him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew." See also *Bolling* v. *State,* 54 Ark. 601; *Green* v. *State,* 64 Ark. 534. It is unquestionably true that one may be possessed of a delusion concerning one subject and yet be of sound mind on all other subjects, according to the weight of modern authority, and this should be so declared as a proposition of law. Gardner on Wills, 120, note. See *Banks* v. *Goodfellow,* L. R. 5 Q. B. 549; *Taylor* v. *Trich,* 165 Pa. St. 586; *Dew* v. *Clark,* 3 Add. Ecc. 79; Buswell on Insanity, chap. 1, p. 19, § 15; chap. 9, p. 270 note; chap. 11, p. 380, § 381 note 3; § § 273, 274.

The mere existence of a delusion, however, as we have said, "is not sufficient to invalidate a will. Its connection with the will must be made manifest and shown to have influenced its provisions." If, notwithstanding the delusion, the will was directly traceable to another cause, it should not be avoided. 1 Wharton & Stille, § 84; *Hemingway's Estate,* 195 Pa. 291; *McGovran's Will,* 185 Pa. 203; *Dale* v. *Dale,* 36 N. J. Eq. 281; *Hollinger* v. *Syms,* 37 N. J. Eq. 233; *Reichert* v. *Reichert,* 107 N. W. (Mich.) 1057; *Bonordi's Will,* 24 N. Y. Supp. 188; *Den* v. *Gibbons,* 2 Zab. 117, 138; *Wetz* v. *Schneider,* 78 S. W. (Tex.) 394; *Bain* v. *Clint,* 33 Pac. 542; *Bohler* v. *Hicks,* 48 S. E. 306; In re *Clapham's Estate,* 103 N. W. (Neb.) 61; 1 Clevenger, 297; *Potter* v. *Jones,* 12 L. R. A. 161.

This delusion, which operates to defeat a will made under its influence, may be defined as follows: Where one conceives something extravagant, and believes it as a fact, when in reality it has no existence, but is purely a product of the imagination, and where such belief is so persistent and permanent that the one who entertains it cannot be convinced by any evidence or argument to the contrary, such a one is possessed of an insane delusion. *Dew* v. *Clark,* 3 Add. Ecc. 79; 1 Wharton &

Stille, 80; *Smith* v. *Smith,* 48 N. J. Eq. 570; *Am. Seamen's Friend Soc.* v. *Hopper,* 33 N. Y. 624; *Middleditch* v. *Williams,* 45 N. J. Eq. 734; *Bohler* v. *Hicks,* 48 S. E. 306; *Robinson* v. *Adams,* 62 Me. 369; *Benoist* v. *Murrin,* 58 Mo. 307; *Stanton* v. *Wetherwax,* 16 Barb. 259; 1 Redfield on Wills, chap. 3, § 11, subdiv. 20, 21; *Matter of Will of White,* 121 N.Y. 406; Page on Wills, § 104; *Merrill* v. *Rolston,* 5 Red. Surr. 252; 4 Words & Phrases, 3644, *verbo,* "Insane Delusions."

The above is substantially the definition of. Sir John Nichol in 1826 in the great case of *Dew* v. *Clark, supra,* and it is one that has been approved and followed by a majority of cases and text writers ever since. A delusion cannot be predicated upon any purely esoteric and abstract subjects, for the reason that beliefs concerning such subjects are speculative, and could not be proved false. *Gass* v. *Gass,* 3 Humph. 278; 1 Redfield on Wills, chap. 3, § 11, subdiv. 21. See also in the matter of *Bonard's Will,* 16 Abb. Pr. (N. S.) 185; 1 Clevenger, 303 *et seq.; Thompson* v. *Quimby,* 2 Bradford, 449; *Thompson* v. *Thompson,* 21 Barb. 107; *Smith's Will,* 52 Wis. 543; Anderson's Law Dict. 337; *Owen* v. *Crumbaugh,* 81 N. E. 1044; *Whipple* v. *Eddy,* 161 Ill. 114, 122.

But filial love and gratitude do not belong to a class of theoretical or metaphysical subjects not susceptible of proof. Indeed, there is scarcely anything in our civilization more concrete and real than these emotions growing out of the natural ties of blood, and incident to the family relation. Their presence or absence is manifested, and may be proved, in manifold ways. If a parent believes that his daughter does not love him, or love him as well as she does some others, or is ungrateful to him, the falsity of such belief, if it be false, may be easily shown. The conduct and declarations of the daughter herself, showing her mental status toward him and others, are original evidence. Wigmore on Evidence, § § 1730, 1715, 349, 190.

"Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings as made at the time in question are original evidence. If they are the natural language of the affections, whether of body or mind, they furnish satisfactory evidence, and often the only proofs, of its existence." Greenleaf on Evidence, § 102. See *Beller* v.

*Jones,* 22 Ark. 93; *Jacob* v. *Whitcomb,* 10 Cush. 255. It may also be shown that such erroneous belief, if it be such, is adhered to against all evidence and argument to the contrary. Such belief would therefore be a delusion.

But if the belief be that his daughter does not love him *as much as he wishes,* or *as much as his daughter ought,* or' that his daughter is not *as grateful as he wishes,* or *as grateful as she should be,* then it is not a belief of the total want of affection and gratitude, but only as to the degree thereof. Such a belief necessarily is in the domain of speculation and theory, where no proof can discover its error; for no evidence can measure the quantum of love and gratitude that a father may *wish* his child to have towards him, nor the quantum of love and gratitude that a child should have towards its parent. The unexpressed wishes of a parent as to the degree of love and gratitude that he desired his child to have for him, as well as the quantum of love and gratitude that the child should have for the parent, are so purely psychical and ethical that they are not susceptible of proof. A belief of that kind cannot be shown to be erroneous; nor can it be shown that such a belief would not be changed by evidence and argument. There is no criterion by which to demonstrate the error and unchangeability of such belief, and the whole subject-matter is in the wide realm of speculation, and cannot therefore be a delusion. Anderson's Law Dict. "Delusion;" Buswell on Insanity, § 14.

Evidence is the means by which facts are proved. All evidence must be addressed to the sane mind. That which no sane mind would believe at all does not rise to the dignity of evidence. And a belief in something that no sane man could believe is evidence of insanity. 1 Wharton & Stille, § 83. Evidence, in a legal sense, is external. It is brought into the mind through the senses by the mental faculty of perception, and appropriated by the faculty of reason. Therefore, any evidence will produce some sort of impression or belief in the mind, correct or incorrect. It is a solecism to speak of a belief that is based on any evidence as an insane belief or delusion. A belief grounded on evidence, however slight, necessarily involves the exercise of the mental faculties of perception and reason; and where this is the case, no matter how imperfect the reasoning

process may be, or how erroneous the conclusion reached, it is not an insane delusion. Anderson's Law Dict. "Delusion," note; *Owen* v. *Crumbaugh,* 81 N. E. 1044; In re *Scott's Estate,* 60 Pac. (Cal.) 527. The distinction between an erroneous belief or mistake, based on evidence, and a delusion is clearly drawn in *Smith* v. *Smith,* 48 N. J. Eq. 570, as follows: "A delusion is the mind's spontaneous conception and acceptance of that, as a fact, which has no real existence except in the imagination, and its persistent adherence to it against all evidence. Mistake, whether of fact or law, moves from some external influence which is weighed by reason. Delusion arises from morbid internal impulse, and has no basis in reason." See also the following: In re *McGovran's Estate,* 39 Atl. 816; *Dobie* v. *Armstrong,* 55 N. E. (N. Y.) 305; *Middleditch* v. *Williams,* 45 N. J. Eq. (N. J.) 726, 17 Atl. 826; *Potter* v. *Jones,* 25 Pac. (Ore.) 769; *Steinkuehler* v. *Wempner,* 81 N. E. 482; *Fulleck* v. *Allenson,* 3 Haggard, 527 (by Sir John Nichol); Schouler on Wills, § § 162, 163; *Clapp* v. *Fullerton,* 34 N. Y. 190; *Mullins* v. *Cottrell,* 41 Miss. 324; *Young* v. *Mallory,* 35 S. E. 278; *Davenport* v. *Davenport,* 58 Atl. 535; *Amer. Seamen's Friend Soc.* v. *Hopper,* 33 N. Y. 624; 1 Underhill on Wills, 127. In 1 Redfield on Wills, chap. 3, star page 86, note, it is said: "A belief based on evidence, however slight, is not a delusion, which rests upon no evidence but mere surmise."

Capacity is presumed. The burden of proof is on the one who attacks a will on the ground of insanity; and if the testator's general capacity is conceded, the proof is more difficult, and in such cases the proof of paranoia must be of the clearest and most satisfactory kind. *Mullins* v. *Cottrell,* 41 Miss. 291; *Smith* v. *Smith,* 41 N. J. Eq. 570, *supra;* In re *McGovran's Will,* 185 Pa. St. 203, *supra; Fulleck* v. *Allenson,* 3 Hagg. 527; *Drew* v. *Clark,* 3 Add. Ecc. 79.

The instructions should be confined to the issue, should be based on the evidence, and should be considered as a whole. *Armistead* v. *Brooke,* 18 Ark. 521, 527; *Morton* v. *Scull,* 23 Ark. 289; *Little Rock & F. S. Ry. Co.* v. *Trotter,* 37 Ark. 593; *St. Louis, I. M. & S. Ry. Co.* v. *Rosenberry,* 45 Ark. 256; *Railroad Company* v. *Barry,* 58 Ark. 198. The court should give instructions appropriate to any theory of the cause sustained

by competent evidence. "It is therefore error for the trial judge to refuse to give a specific instruction correctly and clearly applying the law to the facts of the case, even though the law is in a general way covered by the charge given, unless the court can see that no prejudice resulted from such refusal." *St. Louis, & F. S. Rd. Co.* v. *Crabtree,* 69 Ark. 137. Each party has the right to have the theory of the case he contends for, and which he has adduced evidence to support, submitted to the jury upon proper instructions, unless the court in its general charge has declared the law so that the respective contentions of the parties may be presented in argument to the jury without unfairness or prejudice to either. *Prescott & N. W. Ry. Co.* v. *Weldy,* 80 Ark. 454; *Hamilton-Brown Shoe Co.* v. *Choctaw Merc. Co.,* 80 Ark. 440; *St. Louis, I. M. & S. Ry. Co.* v. *Robert Hitt,* 76 Ark. 233; *Luckinbill* v. *State,* 52 Ark. 45; *Smith* v. *State,* 50 Ark. 545.

II. Now, testing the instructions of the trial court by the principles above announced, our conclusions are as follows:

(1) The court properly outlined the issues and correctly defined testamentary capacity in the first instruction asked by appellants and modified and given by the court.

(2) The court erred in striking the second paragraph from appellant's request No. 2. The second paragraph, to-wit: "A belief which is founded on any evidence as a basis is not a delusion," was a concise and correct proposition of law. It was an indispensable test for determining whether a belief of the class under consideration was a delusion, because such a belief is of something in its nature not impossible. It was peculiarly appropriate here because of the testimony of medical experts on behalf of the appellee defining a delusion as "a belief, an idea, held by a person against such ordinary, average information or experience as would to the ordinary, average individual prove sufficient to cause him to give up the idea." This testimony did not meet the legal requirements of a delusion. Yet it was well calculated to cause the jury to conclude that a belief was a delusion if it was held against any evidence that would convince "the ordinary, average individual" to the contrary; whereas the law is that the most extraordinary, eccentric and absurd beliefs are not delusions if based on any evi-

dence and not held against all evidence. Anderson's Law. Dict. "Delusion." In this state of the record, a specific declaration like that contained in the second paragraph was essential to guide the jury to the right conclusion. True, almost the converse of the proposition is stated in the first part of the first paragraph defining delusion; but the idea is not so tersely and clearly conveyed, and the appellants were entitled to have the proposition presented to the jury as they asked it in order to prevent the jury from being misled.

Paragraphs three and four were not improper, although, had the court given the second paragraph, it would not have been error to strike these; for the fourth was in part a repetition of the idea contained in the second, and the third was a repetition of what had already been given in the first instruction.

(3)   The modification by the court of proponent's third instruction and the giving of the second and third instructions for contestant authorized the jury to find against the will if they found that the testator could not comprehend the deserts and relations of his daughter. The court was specifically requested to limit the inquiry as to the mental incapacity, and the consequent failure to comprehend deserts, to that brought about by the delusion. But the court refused the request. Had not the attention of the court been specifically directed to the vice of these instructions, we should say that, taking the instructions as a whole, the proper construction to be put upon these would be that the mental incapacity referred to was only that brought about by the insane delusion mentioned in the other instructions. But the refusal of the court to confine these requests to the specific issue when its attention was called to it indicates that the court was willing that they should be given the broadest sweep of which they were susceptible. In that view they were inconsistent with other instructions, and very misleading and prejudicial. For there was a great deal of testimony tending to show at least moral perversion or *"medical insanity,"* if not delusion; and, in the absence of consistent and clear instructions throughout confining the inquiry to the issue of delusion, the jury might have concluded that they were authorized to find against the will because of what they considered the great moral perversity of Dr. Taylor towards his daughter, which might,

in their opinion, have rendered him incapable of comprehending her deserts. Moreover, the modification of appellant's third request by the paragraph added gave the whole instruction a bad form, for the modification was not germane to the paragraph modified. It presented an independent proposition of law, and should have been asked and given, with the limitation indicated, as a separate proposition. The court erred, therefore; in modifying the third request of appellants by adding the second paragraph, and also in giving the second and fourth at appellee's request without the limitation mentioned. See, in addition to cases already cited on this point *supra, Benoist* v. *Murrin,* 58 Mo. 307; *Lucas* v. *Parsons,* 24 Ga. 640; *Williams* v. *Williams,* 13 S. W. 252; In re *Kendricks' Estate,* 62 Pac. (Col.) 609; *Hardenburgh* v. *Hardenburgh,* 109 N. W. (Ia.) 1015.

(4) The court did not err in modifying appellants' fifth request. The idea contained in the part stricken out had been sufficiently covered in the first and fourth instructions given at the instance of appellants.

(5) The first instruction given at the instance of appellee was erroneous. It was not in conformity with the law we have announced as to delusion. It was not enough that the belief should be false and without foundation of fact to rest upon, but it must also be adhered to against all evidence and argument. The element of this persistency of the belief is entirely absent. Moreover, the court must never declare as a matter of law that a delusion exists upon any given state of facts. In this peculiar class of cases it is never a question of law for the court to determine whether a delusion exists in any case. That is for the jury. See cases noted on this point.

(6) We have already considered the defects in instructions 2 and 4 given on motion of appellee.

(7) Instruction No. 8 given on appellee's motion was the law.

(8) Of the remaining requests of appellants the court did not err in refusing those numbered, respectively, 8, 10, 11, 12, 13, 14, 15, 16, 18, 19 and 22. Such of these as were correct were sufficiently covered by others given.

(9) The court should have given the 7th. The 17th

was of the same purport, but argumentative in form, and was properly refused.

(10) As the court had given appellee's request No. 2, it should also have given appellant's request No. 21.

(11) Requests of appellants numbered 9 and 20 were substantially to the same effect, and were designed to present appellants' theory that the marriage of appellee was the cause of the discrimination against her in the will of her father. Appellee claims that Dr. Taylor was the final victim of a delusion that his daughter did not love him, which first began in a mere apprehension that she might not, as early as 1878, and progressed until it developed into a positive and persistent conviction. If this was true, it is certain that it did not dominate him prior to her marriage, to the extent of causing him to deny her any of the comforts or luxuries of life that could contribute to her physical or mental well being. Prior to that time he seemed extremely solicitous of her welfare. He was generous and indulgent. He gave her excellent educational advantages and extensive travel in this country and in Europe. He administered without stint to her every want, and denied her no pleasure except that of showing her fondness and devotion to her friends and those whom she loved. Of this, however, he complained, and in some instances he protested in such an unnatural way as to warrant the conclusion that all his devotion to his daughter was tinged with supreme selfishness, and that there was a great and unnatural jealousy on his part towards his daughter because of her affections for others. But, notwithstanding all this, there was no diminution of his love for her, and no curtailment of the benefits and kindnesses extended toward her, until she married against his will. He told her before that if she married McClintock it would separate them forever, and begged her on his knees not to do so, and further told her that if she did marry McClintock she could never expect a dollar of his estate. Contemporaneously with the marriage, a marked change came over Dr. Taylor, which was ever thereafter manifested in his conduct towards her. He apparently lost all affection for her. He ceased to show any except a nominal interest in and solicitude for her, himself attributing the fact of her marriage as the cause of their separation forever. He ceased thereafter to write her

regularly at short intervals, as had been his custom. In the letters he did write he upbraided her for her marriage, saying that he could never on that account enter her home. He refused to let her first-born be called for him, giving as his reason that he could not consent for his name to be coupled with one who had done him so great a wrong. He referred to the great wrong she had done him by her marriage, saying that he "believed that God would in some way punish her for her disobedience and ungratefulness." He would not let the matter be discussed with him by his most intimate friends, who sought to reconcile him to the condition; and at last, toward the close of his life, it is shown that he would turn pale, become angry, compress his lips, and leave the home of his most intimate friend when her name was mentioned. Finally, after weeks of consideration and consultation with his attorney, going over the whole matter of his estate and how he wished it distributed in his will, he calmly and deliberately had the clause written which practically disinherited her.

From a consideration of the testimony which tends to establish the above facts, in connection with all the other evidence, appellants contend that Dr. Taylor was of sound mind when he made his will and discriminated against his daughter therein solely on account of her marriage. And it is from this viewpoint especially that they predicate the theory that, no matter if Dr. Taylor was possessed of a delusion concerning his daughter's affections for him at the time he made the will, such delusion did not dominate him in the provision concerning her, but that this was caused through resentment on account of her marriage with McClintock. It was upon this contention and theory that the requests under consideration were made, and we are unable to see how there could be a fair trial of the cause with that theory omitted from the charge of the court. This was such a distinctive contention and feature of the case, as developed by the proof, that we are of the opinion that the appellants were entitled to have it sent to the jury under one of the above specific requests for instructions, according to the authorities heretofore cited.

III. We will next consider the rulings of the court in the admission and exclusion of testimony, taking up the alleged er-

rors by the number and in the order presented in the briefs.

(1)   The court refused to permit Miss Jordan to answer the following question: "Don't you know it to be a fact that in that matter (meaning the suit of the Jordan heirs against Dr. Taylor) very great bitterness of feeling grew up on account of the difference between Col. Johnson and Dr. Taylor, in which your feelings entered?" The question was competent, but the error in not allowing the answer was not prejudicial, because the information sought had already been substantially elicited on cross examination.

(2)   The testimony of appellee was competent. Our statute provides that "in civil actions no witness shall be excluded because he is a party to the suit, or interested in the issue to be tried; provided, in actions by or against executors, administrators or guardians, *in which judgment may be rendered for or against them,* neither party shall be allowed to testify against the other as to any *transactions with* or statements of the testator, intestate or ward, unless called to testify by the opposite party." Sec. 3093 of Kirby's Digest. This statute has no application in a case involving a contest over the probate of a will. It was intended to protect the estates of deceased persons from the attacks of persons who had, or claimed to have had, business transactions with the deceased prior to his death, and who are seeking to establish claims against his estate. This is clearly shown by the language which declares that it is in actions where judgments may be rendered *for* or *against* the executors, administrators, etc. In other words, where a party seeks to obtain a judgment against the representatives of the estate of the deceased, and thus to impair or reduce the estate, the statute applies. But it cannot apply to controversies between devisees among themselves over a will, or between devisees or legatees and the heirs, as to the distribution of the estate by will or otherwise; for in such case the *corpus* of the estate is in no manner affected. There can in such cases be no judgment rendered *for or against the administrator or executor as such* by which the estate is impaired or reduced. In re *Miller's Estate,* 88 Pac. 338, and the many authorities cited therein; also other cases cited in appellee's brief.

(3)   The court erred in admitting the testimony of the

husband of contestant to prove the copy of the letter of contestant to her father, dated May 7, 1895, and in admitting the copy in evidence. Section 3095 of Kirby's Digest provides that "either husband or wife shall be allowed to testify for the other in regard to any business transacted by the one for the other in the capacity of agent." The copying of the letter by the husband of appellee, at her request, was not "*business transacted by the one for the other in the capacity of agent.*" The terms "*and business transacted*" refer to business transactions with third parties, not with each other. The copying of the letter was not a business transaction in which he could act as her agent, she being present. The design of the statute was to enable the husband or wife who had transacted business with some third party, through the other as agent, to prove such business by the agent who transacted it, the principal not having personal knowledge thereof. The testimony was clearly incompetent. *Pingree* v. *Johnson*, 39 Atl. (Vt.) 202; *Hazer* v. *Streich*, 66 N. W. (Wis.) 720; *First Nat. Bank* v. *Wright*, 78 S. W. 686, 688. See also *Mississippi River, H. & W. Ry. Co.* v. *Ford*, 71 Ark. 192.

(4) and (5) Error, but not prejudicial.

(6) and (8) It was proper to admit testimony showing the character and reputation of Mr. McClintock.

(9) and (10) In will contests, where the unsoundness of mind alleged is dementia, the inequalities of the will, the nature and extent of the estate and the sources of its acquisition are proper to be considered in determining the testamentary capacity. Where delusion is alleged as the ground of incapacity, this principle can have no application, further than to show that the testator, if the delusion be established, was dominated by it at the time the will was executed. For this purpose the testimony is competent, just as it is competent, in cases of dementia, to show lack of testamentary capacity. The testimony of Col. Johnson which tended to show what property of appellee's mother passed into the hands of Dr. Taylor, and its value, was proper. The court, however, should be careful to limit it to that, and not permit the testimony along this line to bring in collateral matters that are calculated to prejudice the rights of appellants. Such was the effect of some

of the testimony of Col. Johnson, contained in subdivision number ten, which the court should have excluded.

(11)  No error in the ruling, for the reason that a part of the testimony of Col. Johnson was competent. The motion was general, to exclude all.

(12)  The court permitted the testimony of experts to assume an argumentative and speculative form on the moral phases of Dr. Taylor's conduct towards his daughter and her rights. This was highly improper and prejudicial.

(13) and (14)  No error in the rulings.

(15)  Error; too remote; collateral matter was introduced, but it was not prejudicial.

· (16) to (19)  Rulings were correct.

(20)  The court erred in permitting counsel for contestant to ask Mrs. Taylor this question: "Did you send his daughter, Mrs. McClintock, any notice of his illness?" She answered, over the objections of appellants, that she did not, and was then examined further as to her reasons for not doing so. This was wholly impertinent matter. It was not responsive to anything that was brought out on the examination in chief, and was not proper as original evidence for any purpose. If the reason why appellee was not present at her father's bedside in his last illness was on account of her not receiving notice of such illness, this testimony did not tend to prove it, and, at least, was not the best evidence of that fact. Appellee was a witness, and she was the only one who could testify that she did not receive notice of her father's last illness, for that was knowledge necessarily peculiar to her, and her testimony only could be admissible evidence of that fact. It is never permissible to ask a question that is itself incompetent as preliminary to one that is competent. It was competent to prove, under certain conditions, that Dr. Taylor made no request that his daughter by notified of his last illness. But it was a question to be asked directly, if at all, and without unnecessary and incompetent preliminaries. It was not competent for the purpose of showing personal animosity of Mrs. Taylor towards appellee. It did not tend to show that. It was not competent to show Mrs. Taylor's hostile attitude in the contest, for that was patent from the proceedings. Indeed, it was wholly incompetent for any

purpose whatever, and it seems to us it had no other tendency than to arouse undue sympathy on the one hand, and prejudice on the other.

(21) This was harmless error.

(22) and (23) The rulings were correct.

(23½) This was not prejudicial error.

(24) and (25) The ruling was error. On cross examination Mrs. Taylor was asked with reference to a conversation between herself and appellee on a train between Memphis and Louisville. The question asked her was as follows: "I will ask you, Mrs. Taylor, if, when she came into the train to see you, she asked you if her father had left any word for her, and if you didn't respond, 'No, he had spent his life trying to forget you,' and that you had 'tried to make his life as happy as you could?'" Her reply was, " I positively said nothing of the kind." Appellee was called in rebuttal, and over the objections of appellants the following occurred:

"Q. Mrs. McClintock, did you have the conversation referred to, at the time I mentioned, with Mrs. Taylor, on the train between Memphis and Louisville? A. I did. Q. Did you, in that conversation, ask her if your father left any message for you or any remembrance, and state what you asked her? A. I asked her if my father left any word of love or forgiveness; that it meant more to me than anything. Q. Please state what reply was made to that question? A. And as I remember it, and it is very distinct in my mind, she said that he spent his life in trying to forget me. Q. (By a juror). Said what? A. That he spent his life in trying to forget me, and that she tried to make his life as happy as she could."

Conceding, as appellee contends, that if Dr. Taylor had stated to Mrs. Taylor that "he had spent his life in trying to forget" appellee, it would have been proper for appellee to have shown that fact; and conceding, further, that, if Dr. Taylor did not so state, it was proper to show that Mrs. Taylor told appellee that he did so state, for the purpose of impeaching Mrs. Taylor's testimony, still the above testimony fell far short of proving, or even tending to prove, such a state of facts as that. The questions asked above did not call for anything Dr. Taylor said to Mrs. Taylor concerning Mrs. McClintock.

87—10

Mrs. Taylor was not asked what Dr. Taylor stated to her and she repeated to Mrs. McClintock, and Mrs. McClintock was not asked what Mrs. Taylor told her Dr. Taylor had said. The conversation, if it occurred in the manner indicated by the question asked Mrs. Taylor, was about one year subsequent to the making of the will, and was about a matter wholly immaterial and irrelevant to the issue of whether or not Dr. Taylor, when he made his will, was possessed of a delusion which influenced him to disinherit appellee. So the above testimony falls under the ban of the general rule that "when a witness is cross-examined on a matter collateral to the issue, he cannot be subsequently contradicted by the party asking the question." *McArthur* v. *State,* 59 Ark. 435; *Plunkett* v. *State,* 72 Ark. 409, 412; *Jones* v. *Malvern Lbr. Co.,* 58 Ark. 125; *Butler* v. *State,* 34 Ark. 485.

The evidence did not tend to show any hostile feeling on the part of Mrs. Taylor towards appellee, and was evidently not introduced for that purpose, but for the purpose of impeachment.

(26) The deposition of Epes Randolph was taken on interrogatories and cross-interrogatories before a notary public in Arizona. Randolph was present at the scene between Dr. Taylor and appellee at the Galt House in Louisville, Kentucky. He testified, among other things, that he heard appellee on that occasion tell her father that she no longer loved him or respected his wishes, but hated him and intended to marry McClintock. These statements, if true, were exceedingly important; for, if true, they tended to prove that if Dr. Taylor believed his daughter did not love him his belief was true, and therefore could not be a delusion. Appellee denied that she made any such statements, and the sharp conflict in the evidence at this point rendered the credibility of the witness Randolph a matter of significance to the cause of proponents. In order to lessen or destroy the credibility of this testimony, appellee called in rebuttal one Winn, who was a lawyer, and a brother-in-law of Mrs. Taylor, and who testified, over the objection of appellants, substantially that he was present when the deposition of Randolph was taken, and that there was no one present representing the contestant; that he went out to Arizona for the purpose of interviewing Randolph with reference to the case and

taking his deposition if he found that he would make a witness. That he had the agreement to take the deposition and the interrogatories and cross-interrogatories sent to him, and read them over with Mr. Randolph. He did not ask him any questions, and none were asked him except the reading of the interrogatories that were sent out. The agreement, caption and certificate attached to the deposition of Randolph were by agreement read to the jury. The appellants moved the court to instruct the jury that witness Winn had a right, under the law, to be present at the taking of the deposition of Epes Randolph; but the court refused, and the appellants duly saved their exceptions.

It was error to attempt the impeachment of this witness Randolph by this method. The law prescribes how a witness may be impeached. Section 3138 of Kirby's Digest. The method adopted here is not found in the law, and it would be very unfair to the witness, who is absent, and to the party relying on the testimony of such witness, to permit it to be called in question in a manner not prescribed nor contemplated by the statute. Sec. 3181, Kirby's Digest, provides that "where a deposition is taken upon interrogatories, neither party nor his agent nor attorney shall be present at the examination of the witness unless both parties are present or represented by an agent or attorney, or unless the opposite party, or his agent or attorney, has been seasonably notified of the time and place of taking the deposition, or the party attending has been notified by the opposite party to attend." The deposition was taken, it appears, by agreement, and it is not pretended by appellee that the above statute was not fully complied with. If not complied with, her remedy was to quash the deposition for failure to do so, but not to attack it by the sudden and improvised methods adopted here in the midst of the trial.

The court, having erred in admitting the testimony of Winn in the first instance, only accentuated it by refusing to attempt even to mollify its prejudicial effect by telling the jury that Winn had a right to be present when the deposition was taken.

IV. We have now considered all the assignments of error urged here for reversal except those presented and argued under the heads, "The court should have given a peremptory instruction sustaining the will," and "that the verdict is not sustained

. by the evidence." Under these heads the appellants insist that "contestant's hypothetical case omits facts that were essential, and contains statements that were not facts."

The hypothetical question of appellee was defective in two important particulars: (1). It states with sufficient accuracy of detail the facts which the evidence tended to show about Dr. Taylor's taking his daughter to Little Rock to live after the death of his wife; that, in compliance with her' dying request that appellee and Miss Jordan should not be separated and that the latter should rear appellee, Dr. Taylor arranged to have appellee and Miss Jordan· live with their uncle, Mr. Richard Johnson, in Little Rock. It states correctly the circumstances and conditions of her home life with these relatives from the time she was taken there in 1878 till she was taken away in 1882, showing the conduct of Dr. Taylor towards her on the occasion of his visits to her and her conduct towards him, and showing that Miss Jordan had treated appellee as a mother would treat her child during all this time, and that appellee loved her as a mother, etc. After all this is shown, the question states that "in 1882 Dr. Taylor took his daughter away from Miss Jordan and the family with which she was stopping, without indicating to them his intention of putting her in the permanent custody of others, and placed her in the care of his brother and sister-in-law, Mr. and Mrs. Gip Taylor, at Winchester, Kentucky, saying to the latter that he did not like the influences surrounding her at Little Rock, and· that he did not think Miss Jordan a proper person to raise her, assigning as his reason that he was afraid his daughter's affections would be weaned from him." The question omits the following facts, which are undisputed, and which were proved by the witnesses for appellee: That a suit had been brought by the Jordan heirs, Miss Jordan herself, her brother and sister (Mrs. Gibson), against Dr. Taylor for their alleged interest .in their mother's estate, charging that Dr. Taylor had taken title to property belonging to their mother in his own name; that the suit aroused the most bitter feeling on the part of the brother and sister of Miss Jordan, and the family with whom she and appellee were living, against Dr. Taylor; and that Col. Ben. Johnson, who at-

tended to the lawsuit for them, did not speak to Dr. Taylor up to the time of his death.

· True, Miss Jordan testified that this business difference did not affect her feelings towards Dr. Taylor. She testified that she had always disliked Dr. Taylor since he had married her mother, and that the lawsuit had nothing to do with her feelings; that the suit was attended to by Col. Ben. Johnson, and she had nothing to do with it. She testified that she always treated Dr. Taylor respectfully because he had married her mother, and that he had treated her respectfully and kindly until he took his daughter away from her.

The experts gave their opinion upon the assumption that every material statement in the hypothetical case was true, and that no material statements had been omitted. As one of them, Dr. Green, expressed it, he gave his opinion upon the assumption "that that is a correct statement from beginning to end." This witness, in explaining his reason for declaring Dr. Taylor insane, said: "It seemed as though he took his child from one person to another, not that the moral influences were not good, not that they did not instruct his child in the way she should go and bring her up a useful woman, but he was afraid they would turn her from him and teach her not to love him." Dr. Green further said, if Dr. Taylor "knew that the first lady to whose care that child was committed disliked him very much, and that in her daily life she was constantly thrown in the most intimate relations with people who disliked him, some of whom did not speak to him and never did speak to him up to the time of his death," that the "change of the daughter from the custody of that lady to some one else would not seem an unnatural one," and that if such were the facts they should have been stated to him. Now, it seems to us that the above omitted undisputed facts had an essential bearing on the issue involved. They certainly tended to give a reasonable and natural explanation of why Dr. Taylor should have taken his child from Miss Jordan. They tended to show the reason for his saying "that he did not like the influences surrounding her at Little Rock," and that "he was afraid his daughter's affections would be weaned from him."

Without the above facts being stated, the above reasons that

he gave for his conduct would not furnish an excuse or explanation for it; and, unexplained, it was a most potent factor in the chain of evidence relied upon by appellee to establish the delusion. We are of the opinion that a correct consideration of the hypothetical question by the experts and a just determination of the issues involved demanded that the above facts should be embraced in the hypothetical case.

2. The hypothetical question states that he compelled Miss Didlake and his daughter to accompany him from place to place over Europe and through England and Scotland, when his daughter was in a very precarious condition of health and should have had quiet and rest. We find no evidence whatever in the record tending to establish the above statement. Yet, if the statement was true, it tended to show most unnatural and unreasonable conduct on the part of Dr. Taylor, and was a cogent circumstance, doubtless, in the minds of the experts when they were forming their opinion of his insanity from a review of all his conduct as set forth in the hypothetical case. We find no other defects in the hypothetical question that we regard as material.

Hypothetical questions must fairly reflect the evidence, and unless they do the resultant opinion evidence is not responsive to the real facts, and can have no probative force. *Quinn* v. *Higgins,* 24 N. W. 482. The hypothetical case must embrace undisputed facts that are essential to the issue. In taking the opinion of experts, either party may assume as proved all facts which the evidence tends to prove. The party desiring opinion evidence from experts may elicit such opinion upon the whole evidence or any part thereof, and it is not necessary that the facts stated, as established by the evidence, should be uncontroverted. Either party may state the facts which he claims the evidence shows, and the question will not be defective if there be any evidence tending to prove such facts. When a party seeks to take an opinion upon the whole or any selected part of the evidence, it is the duty of the court to so control the form of the hypothetical question that there may be no abuse of his right to take the opinion of the experts. The right may be abused by allowing the opinion to be given in such a way as to mislead the jury by concealing the real sig-

nificance of the evidence, or by unduly emphasizing certain favorable or unfavorable data. On the above propositions, see 1 Gr. Ev. § 441, pp. 561, 562; *Ince* v. *State,* 77 Ark. 426; *St. Louis, I. M. & S. Ry. Co.* v. *Hook,* 83 Ark. 589.

The opinion evidence must be discredited because it is based upon a hypothetical case which omitted undisputed facts shown by the evidence, and included other facts not proved. We are of the opinion that, unless the evidence of the experts is taken into consideration, the other evidence is hardly sufficient to support the verdict. It is impossible to divine what the opinion of the experts would have been had the hypothetical case reflected the essential and material facts established by the evidence. The case has not been properly and fully developed, and therefore, for the errors indicated, the judgment is reversed, and the cause is remanded for new trial.

McCULLOCH and HART, JJ., dissent as to so much of the opinion of WOOD, J., as holds that there was prejudicial error in the rulings of the trial court.

HILL, C. J., and BATTLE, J., (concurring). We concur in the judgment of reversal, and in all of the opinion upon the points therein declared to be reversible error, and also concur in all the points discussed wherein the rulings were held not to be error, except two:

First, in holding the evidence admissible as to the estate which Dr. Taylor received from his wife, the mother of the contestant. This evidence would be proper, as shown by the authorities, in cases where the attack is on the general capacity of the testator to make a will, but is wholly inapplicable to cases where his general capacity is admitted, where it is admitted he was a man of fine business attainments, and where it is charged that he was only afflicted by a delusion in one particular. Therefore it was wholly irrelevant to the issue thus made to prove the value of the estate which he may have received from the mother of the contestant, and the tendency of such testimony would only be to arouse sympathy in behalf of the daughter, whom the jury would think had not been fairly treated by her father, when the question is not one of fair treatment of the daughter, but one merely of

capacity of the testator to make a will uninfluenced by an alleged delusion.

The other point in which we cannot concur is in holding the 8th instruction to be correct. This instruction, given at the instance of the contestant, tells the jury as a matter of law that a person may be entirely sound mentally on all subjects or as to all individuals save one, and as to that particular subject or individual his mind may be so diseased as to render it impossible to say that he is of sound mind and is capable of reasoning and exercising a sound judgment in regard to the delusion. This division of insanity into partial and total originated, judicially, with Sir Matthew Hale, when Lord Chief Justice of England in the reign of Charles II. This great jurist, who did much for the laws of England, yet was not sufficiently beyond his generation to refuse to enforce the law against witchcraft (he was the last English judge before whom a person was convicted and sentenced to death for witchcraft); still his division of sanity is followed by many courts and many alienists. It finds support in the testimony of eminent alienists in this case, and is opposed by equally eminent alienists, who declare that partial insanity, or monomania, is an impossibility. They say that monomania is an antiquated term which was used by the English writers, and to some extent by the French writers, who thought that a person could be insane on one idea, and that the term and theory has been abandoned within the last forty years, and that the modern thought is that when a person is insane on one point the individual is insane.

One side compares the brain to a barrel of apples, each part separate, and one might be diseased and rot of itself without the other separate particles becoming affected, and so with the part affected by paranoia; while the other side says that the comparison of the brain to a barrel of apples is unfortunate, because the cells in the brain and all parts of the brain are connected together; that between apples there is only contract, but between all parts of the brain there is organic connection, some independent and yet all interdependent.

In view of this disagreement between learned doctors, it is not the province of the court to side with either. It is not a legal question, but the question of insanity is a question of

fact, and the learned doctors may explain it in their own way and according to their own theories, to the satisfaction or dissatisfaction of the jury, but still the question remains with the jury to decide whether the particular person was sane or insane. When scientists are agreed upon these questions, it may be well for the court to state the scientific conclusion, but when the scientists are at large upon it, it is not the province of the court to accept either theory, but to leave it, as all other questions of fact, to be determined in the particular instance. In the cases in this and other courts, cited in Justice Wood's discussion of this subject, the scientific and legal definitions were accepted without question; but now the evidence here shows, or tends to show, that the scientific world or an important part of it has departed from those theories, and the courts should not blindly follow precedents based on other data.. A recent treatise on Medical Jurisprudence thus discusses this subject:

"What is meant by partial insanity? Few legal writers seem to care to analyze what is meant, or can be meant, by a partial insanity. If the words are taken strictly, they must include almost all the insane; for there are few, if any, insane persons who have not some use of their minds. Only the most advanced dements or the most furious maniacs can be placed in a class of patients who have no glimmer of reason, no use of their senses, no power of memory, no play of emotion, however slight; and even of these extreme cases such absolute negation of normal mentality can hardly be affirmed. On the other hand, it is not more reasonable to say that a paranoiac or a melancholiac is only partially insane than to say that a patient with typhoid fever is only partially ill because, perchance, his heart or his kidneys may be sound; or to say that a patient with cirrhosis of the liver is only partially sick because his brain or his knee-joints are not affected by the disease." 1 Wharton & Stille, Med. Jur. § 473.

For these reasons we think the court erred in the eighth instruction, and should merely have given, on this subject, this part of it: "The jury are instructed, in considering the question as to the mental soundness of C. M. Taylor and his capacity to make a will at the date of the paper offered for probate, they should take into consideration all the facts and circumstances

adduced at this hearing bearing upon his relation to his daughter and his alleged delusion in regard to the stâte of her affections for him."